In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1062

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CECIL TURNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 CR 30012—**Joe Billy McDade**, *Judge.*

ARGUED DECEMBER 3, 2007—DECIDED DECEMBER 30, 2008

Before BAUER, EVANS, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*.  A jury convicted Cecil Turner of two counts of making false statements to the FBI and four counts of wire fraud for his part in a fraudulent scheme by which three janitors employed by the State of Illinois worked only a small fraction of their required 40 hours per week but falsified their attendance logs and collected their full salaries. On appeal, Turner contends that his statements to the FBI were not material because the FBI already knew about his involvement in the

scheme and therefore could not have been misled by what he said. We disagree. A false statement need not actually influence the agents to whom it is made in order to satisfy the materiality requirement for this offense; it need only have the possibility of influencing a reasonable agent under normal circumstances. Turner's statements to the FBI—denying that he provided supervisory cover for the janitors' fraudulent scheme—satisfied this standard.

Turner also maintains the evidence was insufficient to convict him of wire fraud. His argument is twofold: He challenges the sufficiency of the evidence on the government's "honest services" fraud theory and the sufficiency of the use of the wires. As to the former, the case was charged and submitted to the jury as a traditional money or property fraud *and* as an honest services fraud. The evidence established that Turner aided and abetted a straightforward money or property fraud—Turner assisted the janitors' fraudulent scheme to collect thousands of dollars in wages for hours they did not work—so the verdict may be sustained regardless of any factual insufficiency on the alternative honest services fraud theory. As for the use of the wires, two of the janitors were paid through direct deposit; under the circumstances of this case, this use of the wires was sufficient to satisfy the wire-fraud statute. The janitors' receipt of falsely inflated wages was the final step—indeed, it was the whole point—of the fraudulent scheme.

## I. Background

Turner was the Director of the Division of Physical Services for the Illinois Secretary of State's office from 1999 to 2005. He supervised over 300 employees who were responsible for cleaning and maintaining various state-owned buildings in Springfield, Illinois. Three of those employees were night janitors Dana Dinora, Steven Boyce, and David Medvesek. Turner promoted Dinora to lead night janitor shortly after being appointed Director in 1999, and the three janitors comprised a cleaning crew responsible for the Herndon Building, the Court of Claims, and the Lincoln Towers. Dinora also worked as an Assistant Superintendent for the City of Springfield Public Works Department where he handled street cleaning and garbage pick-up throughout the city.

Dinora and his crew were required to report to work by 3 p.m. Monday through Friday and stay until 11 p.m. As with any other employee, each was required to submit a leave slip and obtain approval if he was going to be absent during normal work hours. The janitors were supervised by building managers, who in turn reported to the division chief, who was overseen by the deputy director, who reported directly to Turner.

Led by Dinora, the three night janitors devised a scheme to take massive amounts of unauthorized leave without being detected by their supervisors. At its peak the scheme allowed Dinora to collect a full salary while working less than 30 minutes each day and the others to receive full pay while cutting their work hours in half. Sometimes one janitor would remain at work while the

other two were absent; the "on duty" janitor would tip off the absent ones if questioned by a supervisor about the whereabouts of the other members of the crew. The absent janitors would then come in to work, call the supervisor who made the inquiry, or submit an appropriate leave slip. Another feature of the scheme involved leaving a note in one building falsely representing that the absent janitor was working in another building. The three janitors also kept two sets of attendance logs. The first accurately recorded occasions when one or more of the janitors did not work a full shift and submitted a proper leave request. If no one checked their work that night, however, the "on-duty" janitor would replace the first, accurate attendance log with a second log falsely recording that all three had been working the entire night.

The janitors' scheme could not have succeeded without Turner's help. Prompted by requests from Dinora, Turner repeatedly intervened when the janitors' immediate supervisors began to watch the three more closely. In 1999 Building Manager Randy Lewis forced Dinora to prove that he was actually sick before taking more sick days. Dinora complained to Turner, who reprimanded Lewis and told him to leave Dinora and his crew alone. Two other building managers received similar warnings after attempting to more closely supervise Dinora. Building Manager James Carter was admonished by Turner to "stay the hell away from" Dinora and his crew after Dinora told Turner that Carter was watching the Herndon Building. Turner also instructed Building Manager Harry Fanning to leave Dinora's men alone and to stop checking their work.

Turner's efforts to deflect attention from the night janitors' fraud were successful from 1999 until 2003, when Division Chief Dodie Stannard became involved. After receiving numerous complaints about the unsanitary conditions in the buildings that Dinora's crew was assigned to clean, Stannard began to investigate. On a number of occasions, she visited the Herndon Building at night and found no one there cleaning. Just to be sure the men weren't working in another of their assigned buildings, she checked the Court of Claims, but it, too, was deserted. She made a written report to Turner about her investigation and recommended involving the Inspector General. Turner responded harshly, claiming that Stannard had "stabbed him in the back" by putting her concerns in writing instead of passing along the information verbally. He also told her that reporting Dinora's crew to the Inspector General's office was unnecessary as the matter rested with him alone.

The fraud thus went undetected through mid-2005, when Stannard defied Turner and contacted the Inspector General's office. In August 2005 Turner's wife, Doris—a member of the County Board—called Dinora to warn him that Stannard had tipped off the Inspector General. Dinora confirmed this with Turner, who told Dinora to be careful and make sure his crew showed up for work. A week later, inspectors advised Turner of their investigation and told him not to disclose it to anyone. Nevertheless, Turner kept Dinora informed about the Inspector General's inquiry and advised him to watch his crew closely. In September the FBI opened an investigation and Dinora began cooperating. Thereafter Dinora recorded many of his conversations with Turner.

As a result of Dinora's cooperation, Turner became the focus of the investigation. In mid-October FBI agents questioned Turner about the janitors' scheme. He told them that he never "looked the other way" for Dinora or his crew and that he never reprimanded any of their supervisors for checking on their activities at the Herndon Building. He also claimed that he only learned about the scheme in September 2005 and that he complied with the Inspector General's request to tell no one about the investigation. The FBI interviewed him again in November, and Turner stuck to his story. When asked if he told his wife to call Dinora, Turner denied it. The agents then played a tape of Doris Turner warning Dinora about the Inspector General's investigation and explaining that she was calling on behalf of her husband. Turner continued to maintain that he did not ask his wife to make the call.

Turner was charged with four counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 and two counts of making false statements in violation of 18 U.S.C. § 1001.[1] The government's wire-fraud theory was that Turner either aided and abetted the night janitors' fraudulent scheme or deprived the State of Illinois of his honest services.

At the close of the government's case, Turner moved for judgment of acquittal on the wire-fraud charges under Rule 29(a) of the *Federal Rules of Criminal Procedure*, arguing

---

[1] Dinora, Boyce, and Medvesek were charged with four counts of wire fraud and all three pleaded guilty.

insufficiency of the evidence. The district court denied this motion. The court also denied Turner's later motion under Rule 29(c) for judgment of acquittal after the jury returned a verdict of guilty on all charges. Turner appeals, reiterating his challenges to the sufficiency of the evidence in a number of respects.

## II. Analysis

### A. False Statements to the FBI

Turner contends the evidence was insufficient to convict him of making false statements in violation of 18 U.S.C. § 1001.[2] On these counts the government was required to prove that Turner's statements were false; material; knowingly and willfully made; and concerned a matter within the jurisdiction of a federal department or agency—here, the FBI. *United States v. Ringer*, 300 F.3d 788, 791 (7th Cir. 2002). Turner claims there was not enough evidence to prove that the FBI investigation was within its jurisdiction or that his false statements were material.

On a sufficiency-of-the-evidence challenge, we view the evidence in the light most favorable to the verdict and will

---

[2] The statute provides: "Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . (2) makes any materially false, fictitious, or fraudulent statement or representation" shall be subject to a fine and imprisonment of up to five years. 18 U.S.C. § 1001(a)(2).

overturn the conviction only if there is no evidence upon which a rational juror could have found the defendant guilty. *United States v. James*, 464 F.3d 699, 705 (7th Cir. 2006). Adding to this already steep burden is the fact that Turner did not move for acquittal on the charges of making false statements; his Rule 29 motions were directed at the wire-fraud counts. FED. R. CRIM. P. 29(c). Accordingly, he must establish a "manifest miscarriage of justice." *United States v. Banks*, 405 F.3d 559, 569 (7th Cir. 2005). "Manifest miscarriage of justice is perhaps the most demanding standard of appellate review. We will reverse 'only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking.'" *United States v. Taylor*, 226 F.3d 593, 597-98 (7th Cir. 2000) (quoting *United States v. McKinney*, 143 F.3d 325, 330 (7th Cir. 1998) (internal quotation marks omitted)).

Turner's first argument—that the investigation was within the jurisdiction of the State of Illinois, not the FBI—may be dispatched quickly. In *United States v. Rodgers*, the Supreme Court cautioned that the term "jurisdiction" in § 1001 is not given a "narrow or technical meaning." 466 U.S. 475, 480 (1984). Rather, "the phrase 'within the jurisdiction' merely differentiates the official, authorized functions of an agency or department from matters peripheral to the business of that body." *Id.* at 479. The Court concluded in *Rodgers* that "[t]here is no doubt" that the FBI "is authorized 'to detect and prosecute crimes against the United States,'" including, in that case, kidnaping. *Id.* at 481 (quoting 28 U.S.C. § 533(1)).

Here, Turner's statements to the FBI were made during the course of a criminal investigation into possible federal wire-fraud offenses, which falls squarely within the official, authorized functions of the FBI. *See United States v. F.J. Vollmer & Co., Inc.*, 1 F.3d 1511, 1518 (7th Cir. 1993) (finding that the question of jurisdiction is one of law "and a department or agency has jurisdiction only when it has the power to exercise authority in a particular situation"). That the investigation originated with the State of Illinois is irrelevant.

Turner also argues that the statements he made to the special agents were not material because the agents already knew the answers to the questions before they asked him. The FBI was in possession of tape-recorded conversations between Dinora and both Cecil and Doris Turner at the time agents interviewed Turner. During the course of one of the recorded conversations, Doris, on behalf of her husband, warned Dinora about the Inspector General's investigation and told him to be careful about missing work. During a call a few days later, Turner reminded Dinora about the Inspector General's involvement and told him to make sure his crew filled out their leave slips. Turner argues that his statements cannot have been material to the FBI's investigation because the agents had these and other conversations on tape and therefore could not have been misled.

To be material for purposes of § 1001, a statement "must have 'a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States v. Gaudin*, 515 U.S.

506, 509 (1995) (alteration in original) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)); *see also Kungys*, 485 U.S. at 771 (The "central object" of the materiality inquiry is "whether the misrepresentation or conceal-ment was predictably capable of affecting, *i.e.*, had a natural tendency to affect, the official decision."). We have held, however, that "[u]nder section 1001 a false state-ment may be material even though the agency did not rely on it and was not influenced by it." *United States v. Dick*, 744 F.2d 546, 553 (7th Cir. 1984).

Similarly, we held in *United States v. Ranum*, that "it is not necessary for an allegedly false statement to have any ill effect at all, as long as it is capable of having such an effect." 96 F.3d 1020, 1028 n.12 (7th Cir. 1996). Other circuits are in accord. *See, e.g.*, *United States v. White*, 270 F.3d 356, 365 (6th Cir. 2001) ("If the false statements are received by an agency, they may be material even if the receiving agent or agency knows that they are false."); *United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998) ("It is irrelevant whether the false statement actually influenced or affected the decision-making process of the agency or fact finding body."); *United States v. Service Deli, Inc.*, 151 F.3d 938, 941 (9th Cir. 1998) ("[T]he test is the *intrinsic* capabilities of the false statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances.") (internal quotation marks & citation omitted); *United States v. Edgar*, 82 F.3d 499, 510 (1st Cir. 1996) ("[T]he standard is not whether there was actual influence, but whether it would have a tendency to influence."); *cf. United States v. Baker*, 200 F.3d 558, 561 (8th Cir. 2000) ("Materiality does

not require proof that the government actually relied on the statement."); *United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999) ("[A] false statement can be material even if the decision maker did not actually rely on the statement.").

In *United States v. McBane*, 433 F.3d 344 (3d Cir. 2005), the Third Circuit rejected a materiality challenge quite similar to the one Turner advances here. The defendant was a local sheriff who confiscated a rifle from a suspect and later sold it to an FBI informant. When questioned by the FBI about the rifle, the defendant lied and told the agent that it remained in the possession of the sheriff's department at all times. *Id.* at 347. The Third Circuit posed the question presented as follows: "whether the test for 'materiality' necessarily requires that a false statement be capable of influencing an *actual, particular* decision of the agency at issue, or whether the test requires only that a statement be of a type that would naturally tend to influence a *reasonable* decisionmaking agency in the abstract." *Id.* at 350. Citing the materiality standard we have quoted above, the court concluded that a statement's "natural tendency to influence" suggests not that it must *actually* influence the agency but instead puts the focus more broadly on the "qualities of the statement in question that transcend the immediate circumstances in which it is offered and inhere in the statement itself." *Id.* at 351. The court held that the defendant sheriff's statements to the FBI were material—even though the FBI already had the information from its informant—because the sheriff's "misrepresentations, under normal circumstances, could cause FBI agents to re-direct

their investigation to another suspect, question their informant differently or more fully, or perhaps close the investigation altogether." *Id.* at 352.

Here, as in *McBane*, Turner's statements to the FBI probably had very little *actual* influence on the agents because they were already in possession of incriminating recorded conversations between Turner, his wife, and Dinora. The agents were not likely swayed by Turner's false statements because he was on tape saying precisely the opposite to Dinora. But the point of his telling the agents that he did not learn of the trouble in the Herndon Building in September 2005 was to cast suspicion away from him, which in the ordinary course would have an intrinsic capability—a "natural tendency"—to influence an FBI investigation. The same is true of Turner's claim that he had not reprimanded any of his employees for monitoring Dinora's crew, as well as his later denial that he asked his wife to call Dinora on his behalf. Turner's statements were aimed at misdirecting the agents, and this is enough to satisfy the materiality requirement of § 1001.

## B.  Wire Fraud

The wire-fraud statute, 18 U.S.C. § 1343, makes it a crime to use the interstate wires in "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or prom-

ises."[3] To convict a defendant of wire fraud, the government must prove three elements: (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme. *United States v. Radziszewski*, 474 F.3d 480, 484-85 (7th Cir. 2007).

The government advanced two theories on the four counts of wire fraud against Turner: (1) that he aided and abetted the janitors' fraudulent scheme to obtain their full salaries while working only a fraction of their required hours; and (2) that he deprived the State of Illinois of its right to his honest services as Director of Physical Services. The latter theory derives from 18 U.S.C. § 1346, which provides that the term "scheme or artifice to defraud" in the mail- and wire-fraud statutes "includes a scheme or artifice to deprive another of the intangible right of honest services." Turner argues that the evidence was insufficient to establish an honest services fraud and that the use of the wires was not "in furtherance of" the fraudulent scheme.

---

[3] More fully, the wire-fraud statute, 18 U.S.C. § 1343 (2002), read: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

### 1.  Honest Services Fraud

Turner argues that the evidence of an honest services fraud was insufficient because he received no private gain as a result of his participation in the janitors' fraudulent scheme. The "private gain" requirement is this circuit's gloss on the "honest services" variant of mail and wire fraud and is meant to limit the potential for overreach in prosecutions premised on § 1346. *See United States v. Sorich*, 523 F.3d 702, 707-08 (7th Cir. 2008); *United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998). "Section 1346 was added to the Criminal Code in 1988 to equate a deprivation of honest services with deprivation of money or property" under the mail- and wire-fraud statutes. *United States v. Orsburn*, 525 F.3d 543, 546 (7th Cir. 2008). But "given the amorphous and open-ended nature of § 1346 . . . , courts have felt the need to find limiting principles, and ours has been that the '[m]isuse of office (more broadly, misuse of position) *for private gain* is the line that separates run-of-the-mill violations of state-law fiduciary duty . . . from federal crime.'" *Sorich*, 523 F.3d at 707 (quoting *Bloom*, 149 F.3d at 655) (alteration in original) (citation omitted).

There is no evidence that Turner received kickbacks or otherwise personally profited from the janitors' inflated salaries. There *was* evidence that Dinora—in his "day job" capacity as Assistant Superintendent in the Springfield Public Works Department—routinely arranged for expedited refuse removal at Turner's home. But the government did not suggest that this was the "private gain" for purposes of its honest services fraud theory against Turner.

Rather, in closing argument the prosecutor maintained that the private gain was the janitors' unearned salaries, not the preferential garbage collection. In its appellate brief, the government conceded that on this point its case had been flawed; it understood the private-gain requirement to mean that the defendant must have misused his office for *his own* private gain. But in *Sorich*—issued after this case was briefed and argued—we clarified that "[b]y 'private gain' we simply mean illegitimate gain, which usually will go to the defendant, but need not." 523 F.3d at 709.

We noted in *Sorich* that "in most honest services cases, the defendant violates a fiduciary duty in return for cash—kickbacks, bribes, or other payments," but explained that "[n]ot all [honest services] fraud cases follow this precise pattern." *Id.* at 707. The defendants in *Sorich* had misused their public offices for the private gain of third parties—campaign workers who were given civil-service jobs. This was sufficient, we said, because "the true purpose of the private gain requirement—and one that does not depend on who gets the spoils—is to prevent the conviction of individuals who have breached a fiduciary duty to an employer or the public, but have not done so for illegitimate gain." *Id.* at 710. We observed that although "someone up to no good will [usually] be out to enrich himself, not others . . . , '[a] participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants.'" *Id.* at 709 (quoting *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) (alteration in original)). Because the defendants in *Sorich* had "created an illegitimate, shadow hiring

scheme based on patronage and cronyism by filling out sham interview forms, falsely certifying that politics had not entered into their hiring, and covering up their malfeasance," the "hallmarks" of an honest services fraud were present. *Id.* at 711.

*Sorich* thus makes the government's concession in this case unnecessary. But Turner's challenge to the sufficiency of the evidence of honest services fraud falls short for another reason. The government argued that because the evidence was sufficient to establish that Turner aided and abetted a straightforward money or property fraud, his wire-fraud convictions may be affirmed despite any factual infirmity in its honest services fraud case. We agree. It is well established that when a case is submitted to a jury on two correct theories of criminal liability, a general verdict is valid and will not be set aside as long as the evidence supporting one of the possible bases for conviction is sufficient. *Griffin v. United States*, 502 U.S. 46, 59-60 (1991); *United States v. Black*, 530 F.3d 596, 602 (7th Cir. 2008). Although reversal is generally required when on a general verdict only one of two bases for the conviction is *legally* sound, *see Yates v. United States*, 354 U.S. 298, 311-12 (1957), the same is not true when the issue is factual, not legal, insufficiency. When "two correct theories of illegality are presented in the instructions and there is sufficient evidence to convict only on one[,] the jury is assumed to have followed the instruction on the government's burden of proof and therefore to have rejected the insufficiently supported theory." *Black*, 530 F.3d at 602.

Here, Turner claims there was insufficient evidence of *his own* private gain to support a conviction for honest services fraud. We have explained that the private gain need not be his own; the janitors' private gain is sufficient to support his conviction on an honest services fraud theory. But the honest services alternative was unnecessary to Turner's conviction in any event. The evidence was quite enough to convict him for aiding and abetting a conventional money or property fraud, and his conviction may be affirmed on this basis. He does not argue otherwise, except with respect to the "use of the wires" element, to which we now turn.

## 2. The Use of a Wire

The mail- and wire-fraud statutes are not intended to reach all frauds but only those in which a mailing or use of an interstate wire is part of the scheme. *Schmuck v. United States*, 489 U.S. 705, 710 (1989). The use of the mail or wire need not be an indispensable part of the fraud to satisfy the "in furtherance of" element of the offense; it need only "be incident to an essential part of the scheme . . . or a step in [the] plot." *Id.* at 710-11 (alteration in original) (internal quotation marks & citation omitted). "In other words, the success of the scheme must in some measure depend on the mailing [or wire transmission]."[4] *United States v. Seward*, 272 F.3d 831, 836 (7th Cir. 2001). The

---

[4] Cases construing the mail-fraud statute are equally applicable to cases involving violations of the wire-fraud statute. *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006).

defendant himself need not personally cause the mailing or use of the wire; it is enough that the use of mail or wire "will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira v. United States*, 347 U.S. 1, 8-9 (1954) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used."); *United States v. Hickok*, 77 F.3d 992, 1004 (7th Cir. 1996). The mailing or use of the wires need not itself contain false or fraudulent material; a "routine or innocent" mailing or use of the wire can supply this element of the offense, as long as the use of the mail or wire is part of the execution of the scheme. *Schmuck*, 489 U.S. at 714-15; *United States v. Brocksmith*, 991 F.2d 1363, 1368 (7th Cir. 1993).

Here, the wire transmission was the direct deposit of Dinora's and Boyce's inflated paychecks. Turner argues that this use of the interstate wires was a regular part of the janitors' employment, unrelated to and therefore not "in furtherance of" their fraudulent scheme. For support he cites *United States v. Kwiat*, 817 F.2d 440 (7th Cir. 1987), but we think the case is distinguishable. The fraudulent scheme in *Kwiat* involved risky real-estate loans by bank directors who persuaded investors to purchase condo-miniums in which the directors had an interest. No credit checks on the investors or appraisals of the property were performed. When the loans eventually defaulted, the bank lost more than $600,000. The directors were

charged with "honest services" mail fraud in violation of § 1341.[5] The alleged mailings in furtherance of the fraud occurred when the recorder of deeds mailed each mortgage instrument back to the bank after it had been recorded. We held that these mailings were not "in furtherance of" the fraudulent scheme because they "did not make the fraud possible or facilitate it. . . . The mailings are offshoots of the loans, but honest services would have produced the same sort of mailings." *Id.* at 443-44.

*Kwiat* is not analogous here, not least because it was submitted to the jury *solely* as an honest services fraud case. As we have explained, in this case the honest services theory was merely duplicative; the evidence easily established a traditional money or property fraud, so whether the direct deposits were sufficiently incident to Turner's violation of his duty of honest services is beside the point. *See Orsburn*, 525 F.3d at 546 (noting that "[s]ection 1346 is a definitional clause, not a separate crime"). The janitors' inflated wages—full-time pay for part-time work—were at the heart of this money or property fraud, and two of the three were paid by direct deposit. While the after-the-fact mortgage mailings in *Kwiat* did not

---

[5] The indictment followed our decisions in *United States v. George*, 477 F.2d 508, 513 & n.6 (7th Cir. 1973), and *United States v. Dick*, 744 F.2d 546, 550 (7th Cir. 1984), which adopted the "intangible rights" theory of mail fraud. The Supreme Court eliminated this theory in *McNally v. United States*, 483 U.S. 350, 360 (1987), and Congress restored it in 1988 with the passage of § 1346.

facilitate or perpetuate the directors' breach of their duty of honest services, the direct paycheck deposits at issue here were the main object of the fraudulent scheme, the final step in the completion of the plot.

In *Sorich,* we noted that "courts have found that salaries fraudulently obtained" are "money or property" for purposes of a traditional mail- or wire-fraud offense. 523 F.3d at 713 (citing *United States v. Doherty*, 867 F.2d 47, 56, 60 (1st Cir. 1989)). Extrapolating from this point, we held in *Sorich* that the civil-service jobs wrongfully awarded to campaign workers were "property" within the meaning of the mail-fraud statute. *Id.* If a salary fraudulently obtained is "money or property" for purposes of establishing a traditional mail or wire fraud, then the receipt of that fraudulently obtained salary by means of direct deposit completes the plot and is therefore "in furtherance of" the fraudulent scheme.

Turner argues that if the direct deposit of a paycheck can satisfy the use of the wires element of wire fraud, then every employee who commits an act of malfeasance on the job and is paid by direct deposit will be guilty of wire fraud, and the reach of the statute will be unlimited. If the conduct at issue involved an honest services fraud alone—not a money or property fraud—we might share this concern. That is, if a fiduciary breach (or other act of employee dishonesty) plus a paycheck directly deposited (or mailed, for that matter) were enough for liability under § 1346's alternative definition of "scheme to defraud," then the federal mail- and wire-fraud statutes would potentially reach a vast array of fiduciary

and employee misconduct otherwise governed only by state law.

In contrast, here, as we have noted, the evidence established not a deprivation of honest services only but a theft by fraud of money or property. The whole point of the janitors' scheme—the "money or property" object of their scheme to defraud—was to obtain falsely inflated salaries. Turner provided the supervisory cover for this money-for-nothing scheme. That some of the fraudulently obtained wages were paid by way of direct deposit supplies the "use of the wires" element necessary to make this a federal wire fraud.

Our decisions in *Brocksmith* and *Hickok* support this conclusion. The defendant in *Brocksmith* was an insurance agent who used his clients' premium checks to pay for his personal expenses. *United States v. Brocksmith*, 991 F.2d 1363 (7th Cir. 1993). He told his clients to mail their checks—endorsed to him and not the insurance company—to his office. He delayed purchasing their actual policies and instead expropriated the funds for his own use or purchased a policy for a previous customer. He also mailed required medical forms to two customers and sent them postcards setting up meetings to buy more time to cover their premiums. *Id.* at 1364-65. We held that the mailing of the fraudulently obtained premium checks was not only "incidental" to the defendant's scheme, but "it *was* his scheme." *Id.* at 1367. The other mailings allayed customers' suspicions and covered up the defendant's fraudulent activity. "Use of the mails to lull victims into a false sense of security, we have held, violates the mail fraud statute, even if it occurs after the money has

been fraudulently obtained." *Id.* at 1367-68 (citing *United States v. Chappell*, 698 F.2d 308, 311 (7th Cir. 1983), *cert. denied*, 461 U.S. 931 (1983)).

The defendant in *Hickok* submitted fraudulent sales reports to a cellular phone company, and the company mailed him commission checks based in part on those reports. *United States v. Hickok*, 77 F.3d 992 (7th Cir. 1996). We held that this use of the mails was "an essential part of Hickok's scheme to defraud" because "[i]n order to receive commission money which he had not earned and to which he was not entitled," he had submitted false sales reports to the cellular phone company, which in turn sent him commission checks through the mail. *Id.* at 1004. "Obviously, the use of the mails to send commission checks . . . followed in the ordinary course of business, or was at least reasonably foreseeable by Hickok." *Id.* (internal quotation marks omitted).

In both *Brocksmith* and *Hickok*, the "money or property" proceeds of the defendants' fraudulent scheme were received through the mail; in *Brocksmith* it was misappropriated insurance premiums and in *Hickok* it was unearned commissions. Similarly here, the "money or property" proceeds of the janitors' scheme—their unearned salaries—were received via wire transmission. That the direct deposits were a routine part of their employment does not make the use of the wires insufficient; even "routine or innocent" mailings and wire transfers can form the basis of a mail- or wire-fraud conviction if they are part of the execution of the scheme. *Schmuck*, 489 U.S. at 714-15; *Brocksmith*, 991 F.2d at 1368.

Accordingly, for the foregoing reasons, we AFFIRM Turner's convictions for making false statements in violation of § 1001 and for wire fraud in violation of § 1343.