In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-4131

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MICKEY L. DOOLEY,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:08-cr-30010-GPM-PMF-1—**G. Patrick Murphy**, *Judge*.

ARGUED MAY 27, 2009—DECIDED AUGUST 20, 2009

Before CUDAHY, RIPPLE and WOOD, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Mickey L. Dooley was convicted in the United States District Court for the Southern District of Illinois on charges arising out of thefts from the evidence locker of the municipal police department where he was employed. The district court sentenced him to 120 months' imprisonment, followed by three years of supervised release. Mr. Dooley filed this timely appeal challenging both his conviction and his sentence. For the reasons discussed in this opinion, we affirm his

conviction in part and reverse it in part. Because we are reversing his conviction on one count, we also must vacate his sentence and remand his case to the district court for resentencing.

# I

## BACKGROUND

Mr. Dooley was a police officer employed by the Alton (Illinois) Police Department ("APD"). During the time period relevant to this case, Mr. Dooley was the evidence custodian for the APD; in this capacity, he was responsible for collecting and processing evidence at the scenes of major crimes committed within the APD's jurisdiction. He was also in charge of receiving, maintaining and preserving the evidence that was stored in the APD's evidence vault.

The APD's evidence vault was subject to strict security measures. Only five members of the APD, including Mr. Dooley, had access cards allowing entry to the vestibule area outside the evidence vault. Entry to the vault itself required a special secure key; only two copies of that key existed. One was assigned to Mr. Dooley; the second was stored in a secure area in the administration wing of the APD. The cash locker inside the vault required another key for access; only two copies existed. One was assigned to Mr. Dooley and the other was stored in the secured administration wing.

In June 2006, the Olin Community Credit Union in Alton was robbed (the "OCU robbery"). In October 2006, a

local branch of the US Bank was robbed (the "US Bank robbery"). The APD investigated the robberies; it ultimately was able to recover $4,115 in proceeds from the June robbery and $20,029 from the October robbery. Mr. Dooley participated in both investigations and personally deposited the money into the APD evidence vault. On Friday, April 6, 2007, FBI Special Agent Melanie Jiminez contacted Mr. Dooley's supervisor to request that evidence from the OCU robbery be turned over to the FBI for use in the federal prosecution in that case. That same day, Mr. Dooley's supervisor sent him an e-mail to inform him that the FBI wished to retrieve that evidence the following week. On Sunday, April 8—one of Mr. Dooley's days off—surveillance cameras recorded Mr. Dooley inside the evidence vault removing the box containing evidence from the OCU robbery.

On the following Monday, April 9, Special Agent Jiminez called Mr. Dooley to arrange to pick up the evidence. Mr. Dooley told Jiminez that he would provide a container in which to carry the evidence. He also asked her to delay the evidence pickup until the following day. Jiminez agreed. When Jiminez arrived the next day, Mr. Dooley gave her an inventory list to check off while he handled the evidence packages. While Jiminez was looking at the list, the surveillance camera captured Mr. Dooley placing one of the packages under another; as a result, Jiminez never examined the contents of the concealed package. Mr. Dooley then carried the evidence out to Jiminez's car.

Jiminez took the evidence directly to the FBI's secure evidence room, where it remained until Friday, April 13,

2007. On that day, the FBI discovered that most of the money recovered from the OCU robbery was missing and that the original seals on the evidence envelopes had been compromised. Jiminez notified her direct supervisor and the APD. In response, APD Police Chief Chris Sullivan ordered an inventory of the APD evidence vault. He also ordered APD personnel not to enter the vault until after the inventory was completed on the following Monday. Despite Chief Sullivan's order to stay out, Mr. Dooley was recorded entering the vault on both Saturday and Sunday. On Sunday, the cameras also recorded him accessing the APD's cash locker.

The APD conducted an audit of the evidence vault on Monday, April 16, 2007. As a result, the APD discovered that bags containing evidence from the US Bank robbery had been tampered with and that $18,608 was missing from the evidence in that case. Investigators later discovered that an evidence bag containing $9,460 had been cut open, re-sealed, and initialed by Mr. Dooley. Handwriting analysis confirmed that the initials were written by Mr. Dooley.

The APD then terminated its internal investigation and turned the matter over to the Illinois State Police and the FBI. Investigators performed a full audit of the APD's cash locker and discovered that a total of $38,749.58 was missing. Some of the missing currency had been replaced with poor-quality counterfeit bills. The investigation also revealed that Mr. Dooley had removed evidence, including cash, a computer and marijuana, from the scene of a death investigation. He had not booked that evidence or documented its existence in any way.

After discovering the counterfeit currency in the evidence vault, the investigators asked Mr. Dooley if they could search any computers he owned. Mr. Dooley told the investigators that he owned two computers, and he signed a form titled "CONSENT TO SEARCH BY OWNER," which represented that he had ownership and authority over both computers. Investigators discovered that the serial number of one of the computers, an Apple Macintosh laptop, matched the serial number of a computer that had been taken from the home of Lee Fielding, one of the perpetrators of the US Bank robbery.

The investigators then interviewed Mr. Dooley again and asked him if he had stolen the laptop. Mr. Dooley initially denied having stolen it; he insisted that he had bought the laptop from the Apple Store at the Galleria mall in St. Louis, Missouri, for $2,000 in cash. He claimed that he had a receipt at home that would prove his ownership. After about thirty minutes of questioning, however, Mr. Dooley changed his story and admitted that he had stolen the laptop. A forensic examination revealed that he had entered ownership information on the laptop as if it were his own and had used the computer for personal purposes. The examiners also discovered that Mr. Dooley had used the laptop to conduct a Google search on the phrase "financial ruin." R.125 at 959.

Further investigation revealed that Mr. Dooley was in serious financial trouble. He owed tens of thousands of dollars in back taxes; he was the subject of several IRS tax levies and a wage garnishment. The investigators also

uncovered massive gambling losses: In 2006, Mr. Dooley's take-home pay totaled $35,955, but his losses at the Alton Belle Casino totaled $48,424.95. Investigators also discovered that Mr. Dooley did not file a 2006 federal tax return until October 31, 2007, well after he became aware that he was under investigation by the IRS.

On May 22, 2008, the Government brought an eight-count indictment against Mr. Dooley in the United States District Court for the Southern District of Illinois. The crimes alleged were: (1) two counts of making a false statement, 18 U.S.C. § 1001(a)(2); (2) one count of wire fraud, 18 U.S.C. §§ 1343, 1346; (3) one count of attempting to conceal evidence, 18 U.S.C. § 1512(c)(1); (4) two counts of disposal of money stolen from a bank, 18 U.S.C. § 2113(c); (5) one count of misapplication of property under the control of a local government, 18 U.S.C. § 666; and (6) one count of failure to file a tax return, 26 U.S.C. § 7203. Mr. Dooley filed a motion to dismiss the indictment, which the district court denied.

After a two-week trial, a jury convicted Mr. Dooley on all counts. The district court imposed an above-guidelines sentence of 120 months in prison. Mr. Dooley then filed this appeal, in which he challenges the indictment, his conviction and his sentence.

## II

## DISCUSSION

Mr. Dooley raises five points of error. He challenges the sufficiency of the evidence at trial, the sufficiency of

the indictment, the district court's decision to exclude certain evidence at trial, the district court's refusal to give a requested jury instruction and the reasonableness of his sentence. We shall address each of his arguments in turn.

## A. Sufficiency of the Evidence

Mr. Dooley submits that the evidence presented by the Government on each of the eight counts was insufficient to permit any rational trier of fact to conclude that he was guilty beyond a reasonable doubt. He also contends that the district court "rushed" his defense by requiring him to counter two weeks of government evidence in only one day.[1] Appellant's Br. 18.

"A challenge to the sufficiency of the evidence is a difficult task for a defendant. We shall reverse only if, after viewing all of the evidence in a light most favorable

---

[1] This latter assertion is not supported by the record. The portion of the trial transcript to which Mr. Dooley cites does not substantiate his assertion that the court forced him to take less time than he needed to put on his defense. According to the transcript, the court simply asked Mr. Dooley's counsel how much time he would need to present his case. Mr. Dooley's counsel replied, "I would say the better part of the day, your Honor," to which the court responded, "Very well." R.126 at 1401. Mr. Dooley does not claim that he ever asked for more time. Furthermore, he has made no attempt to explain what additional evidence he would have presented if he had more time to put on his defense.

to the government, and drawing all reasonable inferences therefrom, . . . a rational trier of fact could not have found the essential elements of the crime, beyond a reasonable doubt." *United States v. Hearn*, 534 F.3d 706, 714 (7th Cir. 2008) (alteration in original) (citation and quotation marks omitted).

Mr. Dooley points to several pieces of evidence that could have provided a basis for reasonable doubt if the jury had decided to credit them. For seven of the eight counts, however, he fails to identify any element of any of the crimes for which the Government failed to present evidence sufficient to support the jury's verdict. Rather, he simply takes issue with the weight the jury chose to assign to the Government's evidence. This is not an adequate basis on which to challenge a conviction. *See United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008) ("It is up to the jury to weigh the evidence and determine the credibility of the witnesses; we do not second-guess the jury's assessment of the evidence.").

On one of the eight counts, however, Mr. Dooley's challenge has merit. Count 3 of the indictment alleges that Mr. Dooley committed wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. The wire fraud statute makes it a crime to "transmit[] or cause[] to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the pur-pose of executing [a fraudulent] scheme or artifice." 18 U.S.C. § 1343. Count 3 of the indictment alleges that Mr. Dooley engaged in a "scheme to defraud the City of Alton Police Department and the citizens of the South-

ern District of Illinois out of the right to honest services of the evidence officer of the Alton Police Department to preserve the integrity of evidence being stored in connection with criminal investigations and prosecutions." R.25 at 2. The indictment alleges that Mr. Dooley's scheme violated the wire fraud statute by causing an e-mail to be sent from Mr. Dooley's supervisor, David Hayes, to Mr. Dooley on April 6, 2007. In that e-mail, Hayes directed Mr. Dooley "to gather evidence being held in the [APD] evidence vault to return to the [FBI] for a federal bank robbery prosecution." *Id.* at 3-4. The indictment further alleges that Mr. Dooley's "concealment of his misappropriation of evidence was incidental to an essential part of his scheme to continue his employment and further misappropriate evidence," and adds that Mr. Dooley "knew that the F.B.I. would be seeking the return of the evidence in the ordinary course of business and therefore that the use of telephones or email transmissions would occur in the ordinary course of business." *Id.* at 4. The Government's theory is that the e-mail put Mr. Dooley on notice that the FBI would be coming to take possession of the evidence from the OCU robbery and that this information helped him conceal the fact that he had stolen most of the money from that robbery.

We have held that, under certain circumstances, a communication is made "for the purpose of executing" a fraud when the communication facilitates concealment of an ongoing fraudulent scheme. *See*, *e.g.*, *United States v. Turner*, 551 F.3d 657, 668 (7th Cir. 2008) ("Use of the mails to lull victims into a false sense of security, we

have held, violates the mail fraud statute, even if it occurs after the money has been fraudulently obtained."[2] (quoting *United States v. Brocksmith*, 991 F.2d 1363, 1367-68 (7th Cir. 1993))). We need not consider whether the evidence supports a concealment theory in this case, however, because it is clear that the Government failed to prove another requirement of the wire fraud statute: that the defendant "transmit[ted] or cause[d] to be transmitted" a wire communication. 18 U.S.C. § 1343.

The Government based the wire fraud charge on an e-mail message sent by Hayes to Mr. Dooley on April 6, 2007. In that message, Hayes informed Mr. Dooley that FBI Special Agent Jiminez would be coming to collect the evidence from the OCU robbery. The Government submits that, although Mr. Dooley did not send that message himself, he nevertheless "caused" it to be sent because he "acted with knowledge that the use of a wire was reasonably foreseeable." Appellee's Br. 33 (citing *United States v. Ratliff-White*, 493 F.3d 812, 818 (7th Cir. 2007)). To support this theory, the Government relies on the Supreme Court's decision in *Pereira v. United States*, 347 U.S. 1 (1954). In *Pereira*, the Court held

---

[2] The federal mail fraud statute, 18 U.S.C. § 1341, is worded almost identically to the wire fraud statute and is part of the same chapter of the United States Code. We have held that "[c]ases construing the mail-fraud statute are equally applicable to cases involving violations of the wire-fraud statute." *United States v. Turner*, 551 F.3d 657, 666 n.4 (7th Cir. 2008) (citation omitted).

that "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, he 'causes' the mails to be used." *Id.* at 8-9. The Government submits that, because Mr. Dooley could foresee that Hayes would send him an e-mail directing him to get the evidence ready for pickup, he therefore "caused" the April 6 e-mail to be sent.

The Government's position is based on a misreading of *Pereira* and an untenable reading of the wire fraud statute. *Pereira* says that the defendant "caused" a communication when he acted with the knowledge (or reasonable foresight) that such a communication would "follow" from his action. The Government seems to take the view that by "follow," the Court simply meant "occur after." Although this is one meaning of the word "follow," it plainly cannot be the one the Court intended, for such an interpretation would read the word "causes" completely out of the statute. Rather, it is clear that the Court meant that the communication must occur not only *after* the defendant's act, but *as a result of* that act. The statute requires a *causal* connection between the defendant's actions and the communication, not simply a temporal one.

This reading is borne out by the facts in *Pereira* itself. In that case, the defendants had conspired to defraud a widow by falsely representing that one of them was a successful oil speculator. The scheme was successful, and it resulted in the mailing of a $35,000 check from a

bank in Texas to a bank in California. This mailing, which occurred as a direct result of the defendant's scheme and would not have occurred in its absence, was the basis for the defendants' mail fraud conviction, which the Supreme Court affirmed. The mailing did not simply occur *after* the defendants' fraudulent actions; it occurred *because of* them. *See id.* at 8 ("To constitute a violation of these provisions, it is not necessary to show that petitioners actually mailed or transported anything themselves; it is sufficient if they *caused it to be done*." (emphasis added)).

Cases in this circuit and others confirm the requirement that the defendant's actions and the communication at issue must be causally connected.[3] In each of

---

[3] Several of our recent cases illustrate this point. In *United States v. Adcock*, 534 F.3d 635 (7th Cir. 2008), the defendant acquired a government painting contract by concealing his financial interest in the contractor. This resulted in interstate wire transfers of funds from the United States Treasury to the bank account of the operator of the facility being painted; the facility operator then used those funds to pay the contractor. The wire transfers not only were foreseeable to the defendant, but they also would not have occurred in the absence of the defendant's misrepresentations.

In *United States v. Turner*, 551 F.3d 657 (7th Cir. 2008), the defendant supervised janitors who were employed by the State of Illinois. The defendant helped the janitors falsify their time cards to collect wages for time they did not actually work. As a result, the interstate wire transfers of their pay-

(continued...)

these cases, the mailing or wire transmission on which the conviction was based either would not have occurred, or would have occurred in a substantially different form, in the absence of the defendant's fraudulent conduct.

---

[3] (...continued)

checks were for an inflated amount. If not for the defendant's misconduct, no wire transfers in those amounts ever would have occurred.

In *United States v. Ratliffe-White*, 493 F.3d 812 (7th Cir. 2007), the defendant was convicted of wire fraud based on a communication sent from the United States Department of the Treasury in Maryland to the Federal Reserve Bank in Dallas; that communication instructed that payment be made to the defendant's fraudulent business. *Id*. at 815-16. This court held that the defendant caused a wire transmission in furtherance of her scheme because she knew that payments would be electronically transmitted to her account and therefore "she clearly foresaw that her fraud . . . *would result in* wire transmissions." *Id*. at 819 (emphasis added).

Language in cases from other circuits also reflects the necessity of a causal connection. *See, e.g., United States v. Edelmann*, 458 F.3d 791, 812 (8th Cir. 2006) ("The statute provides that a defendant must 'cause' the use of mails, but a defendant will be deemed to have 'caused' the use of mails . . . if the use was the reasonably foreseeable *result of* his actions." (emphasis added) (citation and quotation marks omitted)); *United States v. Bruckman*, 874 F.2d 57, 60 (1st Cir. 1989) (holding that a defendant satisfies the causation requirement by "doing some act *from which* it is reasonably foreseeable that the mails will be used") (emphasis added) (citation and quotation marks omitted)).

That causal connection is absent in this case. Even if Mr. Dooley never had committed any theft, the FBI still would have asked to take possession of the OCU money in order to use it in the federal prosecution for that bank robbery, and Hayes would have sent Mr. Dooley exactly the same e-mail message asking him to prepare that evidence for the FBI. Mr. Dooley's conduct had no effect on either the existence of that wire transmission or its content. He did not "cause" it to be sent in any sense of the word. *Compare United States v. Kwiat*, 817 F.2d 440, 443-44 (7th Cir. 1987) (reversing a mail fraud conviction where "honest services would have produced the same sort of mailings" as the ones the defendants made), *with United States v. Mitchell*, 744 F.2d 701, 704 (9th Cir. 1984) (affirming a mail fraud conviction where the mailings "would not have occurred except as a step in the scheme").

Because he did not transmit or cause the transmission of any interstate wire communication, Mr. Dooley is not guilty of wire fraud. His conviction on Count 3 therefore must be reversed, and an order of acquittal must be entered on that count.

## B. Sufficiency of the Indictment

Mr. Dooley submits that the case against him should have been dismissed because the indictment was inadequate under Rule 7(c)(1) of the Federal Rules of Criminal Procedure. Rule 7(c)(1) provides that "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Mr. Dooley contends that none of the

counts in the indictment were "suffic[i]ent enough to provide any factual particulars to fully, directly and without any ambiguity inf[or]m [him] of what he must be prepared to meet." Appellant's Br. 12.

An indictment is sufficient if it meets three require-ments: "First, it must state each element of the crimes charged; second, it must provide the defendant with adequate notice of the nature of the charges so that the accused may prepare a defense; and third, it must allow the defendant to raise the judgment as a bar to future prosecutions for the same offense." *United States v. Castaldi*, 547 F.3d 699, 703 (7th Cir. 2008) (citation omitted). To mount a successful challenge to the sufficiency of an indictment, a defendant must show that the indictment failed to satisfy one or more of these requirements. "Moreover, the defendant must demonstrate prejudice from the alleged deficiency in the indictment." *Id*.

Mr. Dooley appears to argue that the indictment failed to satisfy the second requirement. We cannot agree. Contrary to Mr. Dooley's claims, each of the counts in the indictment contained sufficient detail to put him on notice about the nature of the Government's accusations. The only count that even comes close to falling short of this requirement is Count 7, which states that Mr. Dooley "intentionally misapplied property valued at $5000 or more." R.25 at 5. The description accompanying that count does not provide specific information about the property or how it was misapplied. This omission, how-ever, does not render the indictment insufficient. Indict-ments are to be read "practically and as a whole, rather

than in a 'hypertechnical manner.' " *Castaldi*, 547 F.3d at 703 (quoting *United States v. Fassnacht*, 332 F.3d 440, 444-45 (7th Cir. 2003)). When the indictment is read as a whole, it is clear that the property described in Count 7 is the cash and the laptop, the misapplication of which are described in detail in the previous counts.

In any event, Mr. Dooley has not alleged, much less proved, that he suffered any prejudice from the alleged infirmities in the indictment. Indeed, he never asked for a bill of particulars. Nor does he deny that the Government had an "open file" policy. It is clear from the record that Mr. Dooley and his counsel understood the Government's allegations and were able to mount a vigorous, albeit unsuccessful, defense at trial.

## C. Exclusion of Evidence about Possible Previous Robberies

Prior to Mr. Dooley's appointment as the APD's evidence custodian, the Department moved from its old department building to a newly constructed building—the same building that it occupies today. The evidence vault in the old building lacked many of the security and surveillance features present in the new building. After the move, but before Mr. Dooley became evidence custodian, the APD conducted an evidence audit to ensure an accurate accounting of all the evidence in the new vault. This audit revealed that some items listed in the APD's records were not physically present in the inventory, which raised the possibility that they might have been stolen from the old evidence facility.

At trial, Mr. Dooley sought to introduce evidence about these missing items. The court excluded the evidence for two reasons. First, the court noted that the inventory documents were undated and unsigned, and therefore lacked proper foundation. The court further concluded that, even if a foundation could be laid, the "real problem" was that the evidence was irrelevant: The fact that thefts might have occurred at a different, less-secure facility, years before Mr. Dooley became evidence custodian, had no bearing on the allegations against Mr. Dooley. R.127 at 1494.

Mr. Dooley also sought to present evidence related to the possible theft of some guns that once had been in the vault but went missing after being moved to another, less-secure part of the building. The guns had been properly checked out of the evidence locker and slated for destruction, but no record could be found indicating that the destruction actually took place. The court rejected this evidence, too, because it concluded that, even if Mr. Dooley could prove that thefts of evidence from outside of the vault had occurred, such thefts were irrelevant to whether someone besides Mr. Dooley could have stolen evidence from inside the secure vault.

Mr. Dooley submits that the exclusion of this evidence was erroneous. The Government argues that the court did not err in excluding the evidence, and that if there was any error, it was harmless in light of the "overwhelming" evidence of Mr. Dooley's guilt. Appellee's Br. 31.

We review a district court's relevance determinations for abuse of discretion. *United States v. Gill*, 58 F.3d 334,

337 (7th Cir. 1995). We do not believe that the court abused its discretion in excluding evidence about the alleged prior thefts. Mr. Dooley's theory of defense was that someone else had stolen the cash from the evidence vault. Given the extreme security measures that were in place in the evidence vault, it is difficult to see how the possibility of thefts at some undetermined time in the past from other, less-secure facilities would have any bearing on whether Mr. Dooley's explanation for the theft of the money was possible. The district court therefore acted reasonably in excluding the proffered evidence as irrelevant. *See* Fed. R. Evid. 401. Moreover, any minimal relevance that the evidence of the alleged thefts might have had was likely outweighed by the risk that it would waste time and distract the jury from the central issues in the case. *See* Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Given these circumstances, the district court did not abuse its discretion in excluding mention of the alleged prior thefts.

## D. Proposed Jury Instruction

Mr. Dooley next challenges the district court's refusal to give a proposed jury instruction with respect to Count 2 of the indictment. Count 2 alleged that Mr. Dooley violated 18 U.S.C. § 1001(a)(2) by making a false statement to FBI agents in an interview on May 18, 2007. In that

interview, the FBI agents asked Mr. Dooley if he had stolen the Apple Macintosh laptop. Mr. Dooley told them that he had not stolen the laptop but, rather, had purchased it from the St. Louis Apple Store for $2,000 cash. Approximately 30 minutes later, however, Mr. Dooley changed his story and admitted to having stolen the laptop.

At trial, Mr. Dooley requested the following jury instruction:

> The defendant recants his false declaration when, in the same continuous interview, he admits to investigators that his earlier declaration was false. However, in order for the defendant to recant his testimony, he must admit the falsities: before the interview has been substantially affected by the statement, or before it has become manifest to the defendant that the false declaration has been or will be exposed to the investigators.

R.142. The district court declined to give the requested instruction. The jury found Mr. Dooley guilty on Count 2. He submits that it was error for the court to decline to give the instruction.

A defendant is entitled to a theory-of-defense jury instruction if:

> (1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the appellant a fair trial.

*United States v. Eberhart*, 467 F.3d 659, 666 (7th Cir. 2006) (quoting *United States v. Buchmeier*, 255 F.3d 415, 426 (7th Cir. 2001)). Mr. Dooley's proposed instruction fails to satisfy the first and second requirements. The proposed instruction was not an accurate statement of the law in this circuit. In *United States v. Beaver*, 515 F.3d 730, 742 (7th Cir. 2008), we expressly held that "§ 1001 contains no recantation defense." Mr. Dooley's instruction also was unsupported by the evidence in the case. The instruction proposed a recantation defense when the defendant recants "before it has become manifest to the defendant that the false declaration has been or will be exposed to the investigators." R.142. The undisputed evidence in this case, however, establishes that Mr. Dooley recanted his statement about the laptop only after investigators confronted him with a receipt proving that the laptop had been purchased by the bank robber, Larry Fielding. Thus, the facts in this case did not support the proposed instruction.

For these reasons, the district court did not err in declining to deliver the proposed instruction.

### E. Sentencing

Because we are reversing Mr. Dooley's conviction on Count 3, we must vacate his sentence and remand the case for resentencing. *See United States v. Shah*, 559 F.3d 643, 644 (7th Cir. 2009) ("[A]lthough he received concurrent sentences . . . , [the defendant] is entitled to a shot at persuading the judge to give him a lighter sentence in view of the acquittal that we are directing."). Accordingly,

we need not address Mr. Dooley's objection to the rea-
sonableness of his original sentence.

## Conclusion

For the reasons set forth above, we affirm Mr. Dooley's
conviction on all of the counts in the indictment except
Count 3. We reverse his conviction on Count 3 and remand
to the district court with instructions to enter an order
of acquittal on that count. Mr. Dooley's sentence is
vacated and the case is remanded to the district court
for resentencing.

AFFIRMED in PART, REVERSED in PART,
VACATED and REMANDED with INSTRUCTIONS