# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-2549

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ANDREW S. WHITE,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 02 CR 165—**John Daniel Tinder**, *Judge.*

_____

ARGUED JANUARY 12, 2004—DECIDED MAY 11, 2004

_____

Before POSNER, EASTERBROOK, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Based upon an allegation of evidentiary error, Defendant Andrew S. White appeals his judgment of conviction for possession of firearms as a convicted felon, 18 U.S.C. § 922(g)(1) (2003), entered pursuant to a jury's verdict. He also appeals his sentence, claiming that the district court erred when it increased his offense level under U.S.S.G. § 3C1.1 (2003) for attempting to suborn perjury. We affirm both White's conviction and sentence.

## I.  History

In October of 1992, White was on probation and under supervision by the Marion County, Indiana Probation Department. White had informed his probation officer that he was residing alone in Indianapolis. He was the sole lessee and the named electrical-service subscriber for the residence. A condition of White's probation allowed unannounced searches of his living quarters by law enforcement and/or probation officers. Such a search was conducted on October 18, 2002 by Indianapolis police officer Michael Elder, two other uniformed officers, and a probation officer.

The residence had two bedrooms, one in the northeast corner of the house, and one in the northwest corner of the house. Upon entry, Elder observed a female on the bed in the east bedroom and another male exiting the bathroom. The identities of these two persons were never ascertained by officer Elder. After being advised of his Miranda rights, White told Elder that the east bedroom was his. Elder then searched the east bedroom.

During the search of the bedroom, Elder found male clothing, various financial papers, and two firearms. Specifically, Elder discovered a Tarus .45-caliber handgun and a Cobray-11 nine-millimeter weapon in the dresser. In addition, numerous *Indianapolis Star* customer invoice forms were found, which contained customer subscription information and credit card numbers. White stated that his fingerprints could be found on the weapons, but that they were not his. He also indicated that he believed he could have weapons in his house.

Based upon the foregoing facts, a grand jury indicted White for the unlawful possession of firearms by a convicted felon. Both parties stipulated that White was a convicted felon and that the weapons in question had traveled in interstate commerce. Hence, the only issue for trial was

whether White, and not another occupant or visitor in White's residence, possessed the weapons.

To prove this, the prosecution planned to introduce the *Indianapolis Star* documents at trial, in addition to other evidence, to suggest the inference that if the documents were White's, because they were found in the bedroom dresser, then the other items in the dresser were also White's, including the two weapons. The prosecution proffered the following facts to show that the *Star* documents were White's: (1) White worked at the *Indianapolis Star* newspaper from March to July of 2002, in the building services department; (2) he worked the late shift, from 10:00 p.m. to 6:30 a.m., when few employees were present; (3) White had access to all areas of the *Star's* facilities, including the circulation department where customer subscription invoices were processed and stored; and (4) none of the other guests in his home had an opportunity to obtain customer invoices from the *Star*. However, these facts also indicated that White may have committed identity theft. Hence, the government gave notice to White prior to trial of its intent to offer the evidence under Rule 404(b), which limits when such prior "bad acts" evidence may be admitted. The defense objected, arguing that the evidence would unfairly prejudice the jury against the defendant.

The experienced district court judge repeatedly reserved ruling on the admissibility of the documents, waiting to assess whether the government's evidence at trial lived up to its promise—both sufficiently linking White to the *Star* documents and obviating any links between the documents and other visitors to White's residence. The district court ultimately determined that the prosecution had shown by a preponderance of the evidence that the documents were White's. The 404(b) evidence was therefore admitted, with limiting and cautionary instructions from the district court stating in part, "You may consider this evidence only on the question of the identity of the person or persons

who possessed the firearms found in that dresser. . . . The defendant is not on trial for any crime or any criminal offenses or conduct not charged in the indictment and he is accused of no misconduct in connection with the [*Star* documents]. . . . So you may consider [this evidence] only for the limited purposes on the question of identity."

White presented a simple theory of defense: he did not know the guns were in the residence and, even if he did, he did not have the ability to exercise dominion and control over them. *See United States v. Thomas*, 321 F.3d 627, 636 (7th Cir. 2003) (discussing constructive possession). At trial, four witnesses testified on White's behalf: Chandra Baker (White's ex-girlfriend), Nita Reeves, DeWayne Lane, and Angela Cheshier. Baker, Reeves, and Lane each testified that White used the west bedroom and each gave substantially similar accounts of their collective comings and goings from White's residence both generally and specifically on October 18. In short, each testified that a man known to them only as "Ted" brought a gun into White's house and hid it in the dresser on October 18. But, after being confronted during cross-examination with tape recordings of conversations between themselves and White, all three witnesses—Baker, Reeves, and Lane—admitted that White had discussed their testimony with them prior to trial, in order to ensure that "everyone [was] on point" and that no one talked until they knew the "script."

The jury rejected White's theory of defense and returned a guilty verdict on March 14, 2003. At sentencing, the government sought a two-level enhancement under U.S.S.G. § 3C1.1 because, they asserted, White attempted to suborn perjury. Based upon the trial testimony of Baker, Reeves, and Lane, and the sentencing hearing testimony of Special Agent Steven Alexander of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATF"), who had listened to recordings of phone calls made by White from the Marion County Jail to his witnesses prior to trial, the district court

concluded that the enhancement applied and added two levels to White's criminal offense level. On June 3, 2003, White was sentenced to 115 months imprisonment.

## II. Analysis

### A. Federal Rule of Evidence 404(b)

White first argues that the district court abused its discretion when it admitted the *Indianapolis Star* documents, which suggested that White may have committed identity theft. Under Rule 404(b), evidence of a defendant's prior "bad acts" may be admissible if it is relevant to an understanding of the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). The rule's use of the phrase "may be" indicates that the admissibility of "bad acts" evidence is a matter soundly committed to the trial court's discretion. Indeed, it is a rare circumstance, one where the record contains no evidence on which the district court could have rationally based its ruling, when this court will find that the district court abused its discretion. *See United States v. Conley*, 291 F.3d 464, 472 (7th Cir. 2002). Hence, "[a]ppellants who challenge evidentiary rulings of the district court are like rich men who wish to enter the Kingdom: their prospects compare with those of camels who wish to pass through the eye of the needle." *Untied States v. Glecier*, 923 F.2d 496, 503 (7th Cir. 1991). White is not so fortunate.

We have established a four-prong test to determine the admissibility of "bad acts" evidence under Rule 404(b), such as the *Indianapolis Star* documents at issue in this case. *E.g.*, *United States v. Joseph*, 310 F.3d 975, 978 (7th Cir. 2002). First, the evidence must be probative of an issue of the case, other than the defendant's propensity to commit crimes, such as knowledge, intent, motive, or absence of mistake. Second, the prior bad act must be similar enough

and close enough in time to the charged offense to be relevant. Third, the jury must be able to find by a preponderance that the defendant committed the prior act. Finally, the danger of unfair prejudice to the defendant cannot substantially outweigh the probative value of the evidence. *See id.*

Here, the district court's decision to admit the *Indianapolis Star* documents, evidence tending to show a prior "bad act" (identity theft) by White, with limiting instructions was amply supported by the record. First, the documents were offered by the prosecution to counter White's theory of defense, that the firearms were not his and that he did not have the ability to exercise dominion and control over them, and not merely to show White's propensity to commit crimes. If the documents were possessed by White—an evidentiary showing the district court required the prosecution to demonstrate by a preponderance before the court admitted the documents—then the jury could infer that White kept his belongings in the dresser, and therefore, the weapons which were also found in the dresser were also possessed by White. And under Rule 404(b), a court may properly admit "bad acts" evidence to prove the identity of a defendant (i.e., the identity of the person who owned or "possessed" the weapons at issue here). At the very least, it was no abuse of discretion for the district court to determine that the *Indianapolis Star* documents were relevant to the issue of the defendant's identity with respect to possession of the weapons, and White concedes as much in his brief to this court.

Second, the documents were kept in temporal and spatial proximity to the weapons at issue in this case. Hence, the second requirement requiring sufficient similarity between the Rule 404(b) evidence and the charged conduct is met. And not surprisingly, White concedes this issue as well.

Third, a reasonable jury must be able to conclude, by a preponderance of the evidence, that the prior "bad act"

occurred. *United States v. York*, 933 F.2d 1343, 1352 (7th Cir. 1995). In this case, the district court went to great lengths to ensure that the prosecution had demonstrated that more likely than not it was White—and not some other houseguest or other visitor—who had obtained the *Star* documents. So again, White concedes this issue.

Last, the probative value of the evidence must not be substantially outweighed by its prejudicial effect. The district court carefully analyzed this question and gave limiting instructions to the jury both when the evidence was admitted and when the jury was finally instructed. The evidence was highly probative of White's identity, and the "bad act" was not of the type which typically arouses strong passions in jurors. *See, e.g., Joseph*, 310 F.3d at 978-79 (affirming district court's allowance of evidence of mail theft to establish identity when defendant charged with federal bank fraud); *United States v. Anifowoshe*, 307 F.3d 643, 647-48 (7th Cir. 2002) (finding district court correctly admitted evidence of state theft charge and other bad acts because while not unfairly prejudicial, the evidence was probative of identity in federal fraud prosecution). *See generally, United States v. Adames*, 56 F.3d 737, 742 (7th Cir. 1995) (evidence is prejudicial if it will induce jury to decide the case on improper basis, commonly an emotional one). If there was any prejudice to White, it certainly did not substantially outweigh the probative value of the evidence.

Therefore, we conclude that the learned district judge did not abuse his discretion in admitting the *Indianapolis Star* documents under Rule 404(b).

## B.  Sentencing Enhancement for Suborning Perjury

Second, White challenges the two-level upward adjustment of his sentencing level for obstruction of justice under U.S.S.G. § 3C1.1 (2003). We review for clear error a district

court's finding that a defendant obstructed justice. *United States v. White*, 240 F.3d 656, 660 (7th Cir. 2001). And under this standard, a district court's factual findings will not be disturbed so long as they are plausible in light of the record in its entirety. *Id.* at 660-61. The subornation of perjury, where the perjury could affect, to some reasonable probability, the outcome of the judicial process, is a form of obstruction of justice. U.S.S.G. § 3C1.1, cmt. n.4(b). A defendant attempts to suborn perjury when he encourages a witness to testify falsely in an effort to improve his chances of acquittal, *United States v. Duncan*, 230 F.3d 980, 988 (7th Cir. 2000), and the attempt need not have succeeded in affecting the outcome, *see United States v. Buckley*, 192 F.3d 708, 710 (7th Cir. 1999).

White makes three assertions to support his argument that the district court clearly erred when it determined he suborned perjury: (1) the testimony of defense witnesses did not materially differ from the testimony of government witnesses; (2) if there had been an actual attempt to coach his witnesses, the testimony given would have been more helpful to him; and (3) the recorded conversations between White and his witnesses, during which he referred to a "script" and stated that the witnesses should wait until they were all "on point" before talking to his attorney, amounted only to "playful banter." Each of these arguments is totally unsupported by the record and the latter two border on the absurd.

We summarize briefly the testimony of only one of White's witnesses at trial, which, even standing alone, is enough to support the district court's determination that White suborned perjury. In direct conflict with the evidence the prosecution presented, Chandra Baker testified during her direct examination that White used the west—not east—bedroom and that on October 18 she observed "Ted" bringing a weapon into the residence. But after being confronted with a tape recording of conversations between

herself and White on cross-examination, she admitted that White had told her to get together with Erica Johnson and Dewayne Lane to be sure that they knew what to say at the trial, and to include in her testimony certain details. White told her that the ultimate goal was to get everyone together for a "pow-wow" and to "break this down," so that everyone would be "on point." She testified that White told her to "quiz" Johnson and to accomplish these tasks before meeting with his attorney.

Similar testimony was elicited during the direct and cross-examinations of both Nita Reeves and Dewayne Lane. And again each witness admitted to conversations with White only after being confronted with tape recordings. In addition, at the sentencing hearing, BATF Agent Alexander authenticated the tape recordings and conversations.

We therefore find that the district judge, who viewed the witnesses and listened to the tapes first-hand, did not in any fashion err when he found that White attempted to suborn perjury, and consequently increased White's offense level by two for obstruction of justice under U.S.S.G. § 3C1.1.


### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment of conviction and sentence.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*