In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 08-1138 & 08-1161

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROOSEVELT POWELL and WILLIE HARRIS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 06 CR 197—**Philip P. Simon**, *Judge.*

ARGUED APRIL 9, 2009—DECIDED AUGUST 7, 2009

Before MANION, ROVNER, and WOOD, *Circuit Judges.*

MANION, *Circuit Judge.* A grand jury indicted Willie Harris, a Gary, Indiana, lawyer, and Roosevelt Powell, who collected property taxes on behalf of Lake County, Indiana, for their role in the sale of two properties to the Gary Urban Enterprise Association. A jury found Harris and Powell guilty of wire fraud, conspiring to defraud the United States, and filing a false tax return. They appeal. We affirm their convictions and Harris's sen-

tence, but vacate Powell's sentence and remand to the district court for further proceedings.

## I.

Indiana's enterprise zone program was devised in 1983 in an attempt to provide incentives for businesses to locate or expand in distressed and blighted areas. Jim Landers & Dagney Faulk, *In the Zone: A Look at Indiana's Enterprise Zones*, Ind. Bus. Rev., Summer 2005, at 7. Businesses inside the enterprise zone receive tax incentives in exchange for donating a percentage of the tax savings to the local urban enterprise association. *Id*. at 9. The Gary Urban Enterprise Association ("GUEA") was such an association; businesses located within the Gary enterprise zone contributed heavily to it in lieu of paying inventory taxes. However, due to a combination of a large pot of money at the GUEA's disposal—as much as five million dollars a year—and minimal oversight over how the money was to be spent, the GUEA attracted a corrupt abuse of the funds. The GUEA was ultimately dissolved after an investigation revealed that the GUEA's executive director, JoJuana Meeks, was treating the GUEA as her personal bank account. Prior to its demise, however, the GUEA had embarked on a property-purchasing spree, acquiring many properties in Gary for the purpose of redeveloping them. The convictions of defendants Roosevelt Powell and Willie Harris in this case resulted from their roles in the sale of two properties in Gary to the GUEA: a former grocery store located at 6300 Miller, and a vacant building located at 768 Broadway.

**A.  6300 Miller**[1]

Towards the end of 1999, the owners of 6300 Miller, who had long ceased operating the building on the property as a grocery store, let the members of the Lake County Council know that they intended to donate the property to a public charity. William Smith, one of the councilmen and—later—a co-defendant of Powell and Harris, got wind of the intended donation and indicated that he knew of an organization that might have some interest in the property. Harris, an attorney who owned the law firm Willie Harris & Associates in Gary, then contacted Gerald Bishop, one of the lawyers for the owners of 6300 Miller, about the property. He told Bishop that the Gary Historical and Cultural Society ("Historical Society"), a local nonprofit organization, would accept 6300 Miller as a donation. Dharathula Millender, Harris's 84-year-old aunt by marriage, was the Historical Society's president, and Harris was its attorney. The papers for the transfer were drawn up and signed at Harris's law office on December 27, 2000. At the time of the donation, 6300 Miller was appraised for $397,500 and had $37,000 in accrued property taxes, which the Historical Society assumed.

Harris, Smith, and Powell then attempted to sell the property. In the spring of 2001, Powell called Meeks at the GUEA and told her about it. Powell knew her from his work at SRI, a company hired to run the delinquent

---

[1]  We base our account of the facts on the evidence presented at trial, taken in the light most favorable to the government. *United States v. Hach,* 162 F.3d 937, 942 (7th Cir. 1998).

property tax sale auctions in Lake County. Powell had seen Meeks attend several auctions on behalf of the GUEA and, after finding out what she was doing, offered to help her. He eventually assisted Meeks in buying "a lot" of property for the GUEA—including a house he owned in his daughter's name.

Powell and Smith showed Meeks the property at 6300 Miller. Powell told her that the property was in the process of being transferred from the county to the Historical Society (which was not true) and that she could buy it once the transfer was completed. They then discussed a purchase price. Powell stated that they wanted $450,000. After Meeks told him that the GUEA "couldn't do that," the parties quickly agreed on a price of $200,000. Property taxes were not discussed—even though, by this point, the unpaid property taxes had ballooned to $73,000. Powell directed Meeks to prepare a purchase agreement in the name of the Historical Society and to make out the check to that organization. A purchase agreement was prepared and addressed to Millender but signed by Harris on behalf of the Historical Society. While the agreement called for the GUEA to pay the outstanding property taxes, no amount was listed. Meeks assumed that taxes would not be an issue because the county was transferring the property to the Historical Society.

Property taxes did indeed turn out to be a non-issue, but not for the reason Meeks assumed. In addition to his work for SRI, Powell also owned and operated a company named US Research Consultants, Inc. ("US

Research"), which had a contract with Lake County to collect delinquent property taxes on its behalf. On October 2, Lee Christakis, an attorney working for US Research who acted on Powell's instructions, filed a lawsuit against the Historical Society regarding the delinquent taxes owed on 6300 Miller. Despite the fact that the building was in decent shape and the GUEA was paying $200,000 to buy it in order to use it as a training center, the complaint stated that the property was in a state of disrepair necessitating its demolition in order to be restored to a tax-paying basis. Harris personally accepted service of the complaint on behalf of the Historical Society three minutes after the complaint was filed. An agreed order was entered later that day reducing all property taxes due on the property to $15,000, which Harris paid. The Lake County Treasurer—whose permission US Research was required to seek before reaching a settlement with a taxpayer—was not aware of either the lawsuit or settlement.

On the same day as the lawsuit to reduce the property taxes, Powell picked up the $200,000 check from the GUEA. The check was deposited into Harris's law firm trust account on October 3. At the same time, Harris wrote a check from the trust account to himself (postdated October 4) for $50,000 and deposited it into his law firm's business account. He also wrote a check to Smith for $75,000, one to Powell for $25,000, and another to the Historical Society for $50,000. Bank records showed that Smith deposited his check shortly thereafter, while Powell deposited his check about a week later.

Millender deposited the $50,000 check in the Historical Society's bank account a week after Powell. According to her testimony at trial, Millender's entire understanding of how the Historical Society obtained the $50,000 rested on a conversation she had with Smith, during which he had asked her if "they" could "borrow" the Historical Society's 501(c)(3) status[2] for $50,000 "to get a building for a training program for young people." Although Millender was present at the short meeting in Harris's law office during which the documents donating the property to the Historical Society were completed, and even signed the document transferring the property from the former grocery store owners to the Historical Society, she testified that she did not know that the Historical Society ever owned 6300 Miller. Rather, she stated that she had complete trust in her attorney Harris: "if he said sign it, I would sign it. I wouldn't read it. I would sign it, if he said it's something you're supposed to do."

Millender was not told that the Historical Society would have to own any property in order to receive the $50,000. She testified that she would never have taken title to 6300 Miller because the cash-strapped Historical Society had difficulty meeting expenses for the old school building it currently possessed. She was surprised when FBI agents showed her the $200,000 check from the GUEA to

---

[2] Section 501(c)(3) of title 26 exempts from federal income taxation "[c]orporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes."

the Historical Society; she did not know about that check either, or that Smith, Powell, and Harris had pocketed $150,000 of the proceeds. Millender also was never informed about the property taxes owed on the property or the lawsuit filed against the Historical Society. Her signatures both on the $200,000 check and the deed transferring 6300 Miller to the GUEA were forged. She did acknowledge receiving and depositing the $50,000 check on behalf of the Historical Society.

## B.   768 Broadway

The second property sale involved in this case was the sale of the vacant building located at 768 Broadway to the GUEA. Harris paid $2,600 for the property in September 1999. Because he was having marital problems at the time, Harris hid his ownership of the property from his wife by titling the property in the name of Dorothy Ard, a close family friend. Harris told Ard he would pay for the property, its maintenance, and any taxes.

In August 2001, Powell contacted Meeks and told her that 768 Broadway was available, claiming that his client was Dorothy Ard, "an elderly woman who was trying to divest herself and move back south." After viewing the property, Meeks again spoke with Powell, who stated Ard was looking for at least $60,000. Meeks offered $40,000, and Powell said he would contact Ard. Powell called back and claimed that he had spoken to Ard and that she would settle for $51,500. Meeks agreed and gave Powell a GUEA check for $51,500 made out to Dorothy Ard. The check was deposited into Harris's law firm business

account. Powell received $14,000 from Harris for the sale of the building.

At trial, Ard testified that Harris told her in 2001 that he had reconciled with his wife and asked Ard to sign a deed transferring the property back to him. Based on Harris's representation, Ard signed the deed. Harris did not tell Ard he was selling the property; the deed that Ard signed was in fact the deed transferring the property to the GUEA. Ard also did not know that the GUEA had purchased the property for $51,500. Her signature on both the check from the GUEA and the deeds filed in the state auditor's office were forged.

A jury convicted Harris and Powell under 18 U.S.C. §§ 2 and 1343 of wire fraud in relation to the sale of 6300 Miller and under 18 U.S.C. § 371 for conspiring to commit theft of government funds by reducing the property taxes on 6300 Miller. It also found Powell guilty under 26 U.S.C. § 7206(1) for willfully filing a false tax return due to his failure to report the income he received from the sales of 6300 Miller and 768 Broadway. Lastly, the jury convicted Harris under § 7206(1) for failing to report his income from the sale of 768 Broadway as a capital gain. For their sentences, Powell received 37 months' imprisonment, while Harris received 55 months' imprisonment. Both Powell and Harris appeal.

II.

On appeal, both Powell and Harris present several challenges to their convictions and sentences. We turn

first to Powell's challenge to the sufficiency of the government's evidence supporting his wire fraud conviction.[3] Our review of a challenge to the sufficiency of the evidence is quite deferential. We examine the evidence in the light most favorable to the government, *United States v. Useni*, 516 F.3d 634, 646 (7th Cir. 2008), looking only at whether evidence exists from which "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Hach*, 162 F.3d at 942. That standard, by itself, presents "a nearly insurmountable hurdle to the defendant." *Id*. (quoting *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir. 1992)).

The wire fraud statute, 18 U.S.C. § 1343, prohibits the use of the interstate wires in "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." To convict a defendant of wire fraud, the government must prove three elements: (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme. *United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008). Powell argues that the evi-

---

[3] Harris states in his brief that he "adopts and incorporates by reference, without repeating, the standard of review and the argument on the wire fraud issue . . . as presented in the Appellant's Brief of co-appellant Powell." Because Harris does not provide any further argument besides his incorporation of Powell's arguments, we will discuss only Powell's contentions.

dence was insufficient to support a jury finding that he knowingly participated in a scheme to defraud involving the use of the interstate wires in furtherance of the scheme.

We examine first Powell's claim that there was no scheme to defraud. "A scheme to defraud requires 'the making of a false statement or material misrepresentation, or the concealment of [a] material fact.'" *United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007) (quoting *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005)). Powell asserts that there was no false statement or material misrepresentation because Millender and the Historical Society got the benefit of the bargain: Smith promised Millender and the Historical Society $50,000 if "they" could "borrow" the Historical Society's 501(c)(3) status, and Millender and the Historical Society received $50,000. Thus, Powell contends, there was no fraud perpetrated on the Historical Society.

Powell's argument ignores the defendants' failure to give Millender the whole story on *how* the Historical Society was to receive the $50,000. Neither Smith nor Harris nor Powell disclosed to Millender that the Historical Society needed to take title to 6300 Miller, and therefore assume all the burdens of owning that property—including a hefty property tax bill. Nor did they tell her that they were able to sell the property for $200,000, or that they were going to keep nearly three-quarters of the proceeds for themselves. These were significant omissions: Millender testified that she would never have taken title to 6300 Miller because the cash-strapped Historical

Society could not even meet the expenses for the other building it possessed.

Powell claims that Millender should have known that the Historical Society owned 6300 Miller because she was present at Harris's office when the documents were executed transferring 6300 Miller to the Historical Society. But the jury reasonably could have concluded otherwise. Millender testified that she completely trusted Harris, who was her nephew-in-law and the Historical Society's attorney, and that she would sign whatever he put in front of her without reading it. She also repeatedly denied ever knowing that the Historical Society owned 6300 Miller. A jury was entitled to take Millender at her word. "[I]t is not our role, when reviewing the sufficiency of the evidence, to second-guess a jury's credibility determinations." *United States v. Buchmeier*, 255 F.3d 415, 420 (7th Cir. 2001).

Moreover, even if Powell could show beyond dispute that Millender knew the Historical Society owned 6300 Miller, he does not contest that neither he nor Smith nor Powell disclosed to Millender the sale of the property to the GUEA for $200,000. Nor does he contest that they failed to tell Millender that they would pocket three-quarters of the proceeds from that sale. Those omissions are material; absent them, the impoverished Historical Society stood to gain an additional $150,000 in badly needed funds. Significantly, Smith, Powell, and Harris did not merely fail to tell Millender about the sale and their profiting from it. They actively concealed the sale from her, going so far as to forge her signature on both

the $200,000 check from the GUEA and the deed transfer-ring 6300 Miller to the GUEA so that she would never know about the transaction. As we have said before, a failure to disclose information may constitute fraud if the "omission [is] accompanied by acts of concealment." *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005). A reasonable jury certainly could have concluded that is what occurred here. The government thus presented sufficient evidence of a scheme to defraud the Historical Society.

But, Powell asserts, even granting that there was a scheme to defraud, he did not knowingly participate in it. That argument was not raised in either of Powell's Rule 29 motions in the district court, which challenged only the sufficiency of the evidence supporting the scheme to defraud. Powell has therefore forfeited it, and we review only for plain error. *United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006). Under the plain error standard, Powell must show "that a 'manifest miscarriage of justice will occur if his conviction is not reversed.'" *United States v. Hensley*, ___ F.3d ___, 2009 WL 2178650, at *5 (7th Cir. July 23, 2009) (quoting *United States v. Irby*, 558 F.3d 651, 653 (7th Cir. 2009)). "Put another way, reversal is warranted only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element was so tenuous that a conviction would be shocking." *Id*.

There is no such lack of evidence in this case. Powell characterizes his role in the sale of 6300 Miller as merely that of a real estate agent receiving a commission for bringing "together a willing seller with a willing buyer."

Such a characterization, however, does not square with the evidence of Powell's willingness to drop more than 50% off the asking price (and appraised value) of 6300 Miller on the day of the sale,[4] since it is highly unlikely that a legitimate real estate agent would settle so quickly on such a reduction. Nor does it mesh with Powell's role in the fraudulent lawsuit filed on behalf of Lake County to reduce the property taxes owed on 6300 Miller, which he does not challenge in this court.[5] That lawsuit was a fraud on the court. Powell obtained the property tax reduction by falsely representing to the judge through his attorney that 6300 Miller needed to be demolished and by failing to tell the judge that the property was being sold *the same day* for $200,000—an amount easily sufficient to satisfy the back property taxes. A real estate agent receiving a legitimate commission does not, on the same day as the sale, orchestrate a dishonest lawsuit that results in an unauthorized reduction of property taxes to the tune of $58,000. A jury was therefore entitled to reject Powell's real-estate-agent gloss to his involvement

---

[4] Recall that the property recently had been appraised for $397,000 and that Powell had initially told Meeks that his "client" was looking for $450,000.

[5] Both in his reply brief and at oral argument, Powell's attorney expressly admitted that, if the jury chose to believe Lake County Treaurer Peggy Katona's testimony that Powell had not gotten her required authorization for the property tax reduction, the evidence was sufficient for a jury to find against him on count two of the indictment, the § 371 count, which charged a conspiracy based on the fraudulent reduction of the property taxes owed on 6300 Miller.

in the sale of 6300 Miller. *See United States v. Humphreys*, 468 F.3d 1051, 1054 (7th Cir. 2006) ("[A]lternative explanations alone, even if plausible, do not ordinarily overcome the defendant's burden in challenging the sufficiency of the evidence." (quoting *United States v. Romero*, 57 F.3d 565, 570 (7th Cir. 1995))).

Powell disputes that the property tax reduction had any relationship to the scheme to defraud, but that argument is a non-starter. A reasonable jury could have concluded that any tax savings advanced the scheme by going straight to the defendants' bottom line. While the purchase agreement called for the GUEA to pay the outstanding property taxes, no amount was listed. Meeks testified that the defendants had given her the impression that property taxes would not be an issue because they had told her the Historical Society was in the process of obtaining the property from the county. Meeks's testimony is backed by the fact that Harris, and not the GUEA, paid the remaining $15,000 due after the fraudulent lawsuit reduced the property taxes. Because the property tax reduction allowed the schemers to keep more of their ill-gotten gains, it was part and parcel of the overall scheme to defraud.

Powell, however, compares his lot to that of the defendant in *United States v. Rahseparian*, 231 F.3d 1257 (10th Cir. 2000). Like Powell, the defendant in *Rahseparian* was also convicted on circumstantial evidence. But that is where the similarity ends. In *Rahseparian*, the defendant's participation in the illegal scheme was limited to acts that, by themselves, were innocent: doing the banking for his sons, who ran the fraudulent telemarketing scheme at

issue there, and purchasing "lead sheets" for them, a common and perfectly legal way for telemarketing businesses to identify potential customers. The Tenth Circuit held that those activities, in and of themselves, did not support an inference that the defendant knew that his sons' business was defrauding its customers. 231 F.3d at 1263.

In contrast, the lawsuit filed by Powell's company, US Research, which caused a substantial reduction of the property taxes owed, was inherently fraudulent. It represented that 6300 Miller needed to be demolished when in fact it was being sold that day for a substantially discounted $200,000. As we have discussed above, the lawsuit furthered the overall scheme by leaving more money for the defendants to divide amongst themselves. Considering that the evidence showed that Powell himself received $25,000 from the sale of 6300 Miller, the jury could reasonably infer that Powell had knowledge of, and intended to further, the scheme to defraud the Historical Society.

Powell also challenges the use-of-the-wires element of his wire fraud conviction. He claims that there was insufficient proof that the wires were used in furtherance of the fraudulent scheme. Again, Powell's failure to raise this argument in his Rule 29 motions means that we review only for plain error. *Groves*, 470 F.3d at 324.

Our recent decision in *United States v. Turner*, 551 F.3d 657 (7th Cir. 2008), spells out the current state of the law on the use-of-the-wires element:

> The mail- and wire-fraud statutes are not intended to reach all frauds but only those in which a mailing or

use of an interstate wire is part of the scheme. *Schmuck v. United States*, 489 U.S. 705, 710, 109 S. Ct. 1443, 103 L. Ed. 2d 734 (1989). The use of the mail or wire need not be an indispensable part of the fraud to satisfy the "in furtherance of" element of the offense; it need only "be incident to an essential part of the scheme . . . or a step in [the] plot." *Id*. at 710-11 (alteration in original) (internal quotation marks & citation omitted). "In other words, the success of the scheme must in some measure depend on the mailing [or wire transmission]." *United States v. Seward*, 272 F.3d 831, 836 (7th Cir. 2001). The defendant himself need not personally cause the mailing or use of the wire; it is enough that the use of mail or wire "will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira v. United States*, 347 U.S. 1, 8-9, 74 S. Ct. 358, 98 L. Ed. 435 (1954) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used."); *United States v. Hickok*, 77 F.3d 992, 1004 (7th Cir. 1996). The mailing or use of the wires need not itself contain false or fraudulent material; a "routine or innocent" mailing or use of the wire can supply this element of the offense, as long as the use of the mail or wire is part of the execution of the scheme. *Schmuck*, 489 U.S. at 714-15, 109 S. Ct. 1443; *United States v. Brocksmith*, 991 F.2d 1363, 1368 (7th Cir. 1993).

*Turner*, 551 F.3d at 666 (internal footnote omitted).

To satisfy the use-of-the-wires element in this case, the government relied on the transfer of the $200,000 sale proceeds of 6300 Miller from the GUEA's bank through an interstate wire to Harris's trust account. As the object of the scheme to defraud the Historical Society was the money, the actual receipt of the funds into Harris's trust account was an essential part of the scheme. *See Turner*, 551 F.3d at 668. Powell argues, however, that the $200,000 wire transfer is insufficient to support his conviction because the fraud was already completed when the money was received by the bank. Harris's law firm trust account was credited with $200,000 on October 3, 2001, while the interstate wire transfer did not occur until October 5. To support that argument, Powell relies primarily on *United States v. Kann*, 323 U.S. 88 (1944). *Kann* held that the use of interstate means to collect a check does not violate § 1341 because the scheme was complete as soon as the depository bank paid the check:

> The banks which cashed or credited the checks, being holders in due course, were entitled to collect from the drawee bank in each case and the drawer had no defense to payment. The scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires.

323 U.S. at 94; *see also United States v. Maze*, 414 U.S. 395 (1974).

We previously considered *Kann* in *United States v. Franks*, 309 F.3d 977 (7th Cir. 2002), a case involving a medical clinic worker who stole checks from her clinic and deposited them in her personal bank account. There we held that the bank's use of interstate couriers to forward the checks for collection was sufficient for purposes of § 1341. We distinguished *Kann* thusly:

> *Kann* predates the Uniform Commercial Code, which makes it easy for a customer's bank to reverse the credit if the instrument cannot be collected. Franks deposited the checks into her personal account. Even if she drew off the embezzled funds promptly, her own funds remained and could have been debited to cover the loss, had the checks not been sent out of state and paid in due course. This made interstate transportation essential to the scheme's success.

*Franks*, 309 F.3d at 978. That same distinction also applies here. While Harris's trust account may have been credited with the $200,000 immediately, the bank easily could have withdrawn such provisional credit until it received the $200,000 wire transfer. *See* Ind. Code §§ 26-1-4-201(a), 26-1-4-214(a). Had the bank done so, the defendants would have failed to fully execute their scheme to enrich themselves at the Historical Society's expense. (Powell certainly would not have benefitted because he did not cash his check until well after the transfer.) Thus, while the defendants in *Kann* may have received the funds "irrevocably," 323 U.S. at 94, Harris and his co-schemers did not until *after* the wire transfer of the funds. A jury could therefore have reasonably concluded that

a use of the wires was in furtherance of the scheme and find the use-of-the-wires element satisfied on that basis.

We next turn to the defendants' challenges to the sufficiency of the evidence supporting their tax convictions. Powell contests his conviction for failing to accurately report his total income on his 2001 tax return in violation of 26 U.S.C. § 7206(1). He claims that there was not enough evidence of willfulness to convict him. Because Powell did not raise any challenge to that conviction in either of his Rule 29 motions, our review of this issue is for plain error only. *Groves*, 470 F.3d at 324. Recall that, under that standard, the record need only contain some evidence pointing to guilt; as long as the record is not completely devoid of such evidence, we will affirm. *Irby*, 558 F.3d at 653.

We conclude that the record contains sufficient evidence of Powell's guilt on the § 7206(1) count to clear that low hurdle. For conviction, § 7206(1) requires that a defendant "[w]illfully make[ ] and subscribe[ ] any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter." *See also United States v. Pree*, 408 F.3d 855, 865-66 (7th Cir. 2005). In other words, a conviction "under section 7206(1) requires proof that: (1) a person made or subscribed to a federal tax return which he verified as true; (2) the return was false as to a material matter; (3) the defendant signed the return willfully and knowing it was false; and (4) the return contained a written declaration that it was made under

the penalty of perjury." *United States v. Presbitero*, 569 F.3d 691, 700 (7th Cir. 2009).

Here, it is undisputed that Powell's 2001 return, which he signed under penalty of perjury, did not report either the $25,000 Powell received from the sale of 6300 Miller or the $14,000 he received from the sale of 768 Broadway. While the return was prepared by his accountant, the accountant testified that she relied upon her clients for the information she placed in the returns. Failure to supply an accountant with accurate information is evidence of willfulness. *See Useni*, 516 F.3d at 650. Moreover, the jury, when considering Powell's income omission, had before it the evidence of the defendants' fraudulent scheme to profit off of the sale of 6300 Miller. Because the $25,000 was obtained through fraud, Powell had a strong incentive to refrain from reporting the income. *See United States v. Ytem*, 255 F.3d 394, 397 (7th Cir. 2001) ("[T]he fact that illegal income is taxable is widely known, even among lay people.").

In arguing against the government's evidence of willfulness, Powell highlights the fact that he filed an amended return in 2004, after a civil audit, that included the $39,000, the aggregate amount he received from the fraud. However, for what it was worth, Powell was able to put that evidence in front of the jury. And the probative value of it was minimal because it only raised the question of why the information was not included in the first place. *United States v. Ross*, 626 F.2d 77, 81 (9th Cir. 1980). The critical time-frame for determining willfulness is when Powell signed the return, not two years after-

wards. *See United States v. McClain*, 934 F.2d 822, 835 (7th Cir. 1991); *see also United States v. Radtke*, 415 F.3d 826, 840-41 (8th Cir. 2005).

Powell also makes much of the fact that his accountant lost the information that he had provided her about his 2001 income, and that as a result she could not verify for certain that he had failed to provide her the information about the $39,000 he received from Harris for the sale of 6300 Miller and 768 Broadway. Yet that fact was also presented to the jury, and the jury still convicted Powell. In light of the evidence of willfulness we have discussed, the jury's guilty verdict on the § 7206(1) count cannot be seriously challenged; it certainly was not "shocking." *Irby*, 558 F.3d at 653. We therefore will not disturb Powell's conviction for failing to accurately report his total income on his 2001 tax return.

Harris also challenges his conviction under § 7206(1). Like Powell, Harris failed to raise this issue in his Rule 29 motion in the district court, so our review again is for plain error only. *Groves*, 470 F.3d at 324. Harris was convicted for willfully failing to report on his 2001 return, as a capital gain, the $34,900 in profit he made from the sale of 768 Broadway. Harris claims that his conviction should be reversed because he reported that income—just not as a capital gain. At trial, Harris introduced through his wife—who did the accounting work for his law firm—accounting schedules. Those schedules, supposedly used to prepare Harris's 2001 taxes, contained entries for each deposit into the law firm's bank account. One of the entries was the $51,500 check from the GUEA for the

sale of 768 Broadway. Because the total income from the deposits listed on the schedules matched the amount Harris reported for total income on Schedule C, Harris claims that he reported the income from the sale of 768 Broadway on Schedule C.

The government, however, presented evidence casting doubt on that claim. The accounting schedules upon which Harris relied were time-stamped March 31, 2007, one week after the superseding indictment that added the tax count against Harris was handed down. Harris did not provide them to the government until shortly before trial—which was almost a year after the grand jury had subpoenaed them. Moreover, at the time they were subpoenaed, Harris, citing an unspecified "computer crash," told the grand jury that he did not have any papers supporting his 2001 tax return. Such timing of the schedules' disclosure, coupled with the fact that they were under the control of Harris's wife—who had a strong motive to doctor the records—cast doubt on their reliability. *See United States v. Spano*, 421 F.3d 599, 604 (7th Cir. 2005).

Moreover, the schedules were inaccurate. Despite the testimony of Harris's wife that the entries on the schedules would match the actual deposits made into the law firm bank account, they did not. In fact, they were off by more than $200,000. That substantial discrepancy between the record of actual deposits and the accounting schedules reinforces the inference that they were altered. Since those schedules were the only evidence Harris offered to show that he reported the income from the sale, the jury reasonably could have chosen to disbelieve Harris's

claim that he reported the income from the sale. At the very least, Harris has failed to establish plain error.

We turn now to the sentencing issues raised by the defendants.[6] Both Harris and Powell question the amount of loss used to compute their sentences. After grouping their convictions on count one (the wire fraud offense) and count two (conspiring to commit theft of Lake County's funds by reducing the property taxes on 6300 Miller), the court enhanced both Harris's and Powell's sentences twelve levels based on a loss of $208,000. *See* U.S.S.G. § 2B1.1(b)(1)(G). The district court reached that loss amount by adding $150,000 (the loss to the Historical Society, or alternatively the gain to the defendants, from the diverted proceeds of the sale of 6300 Miller) to $58,000, the money the defendants stole from Lake County by illegally reducing the property taxes owed on 6300 Miller from $73,000 to $15,000.

---

[6] Harris's brief states that it "adopts and incorporates by reference, without repeating, the standard of review and the argument on the coerced jury issue" as well as "on the conspiracy to commit theft form [sic] the Historical Society and from Lake County issue, as presented in the Appellant's Brief of co-appellant Powell." Powell, however, did not appeal those issues. Harris has therefore incorporated two non-existent arguments. Because Harris does not present any argument or cite any legal authority in his own brief on those issues, he has waived appellate review of them. *Useni*, 516 F.3d at 658 ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.").

"We review a district court's loss calculations, which need only be 'a reasonable estimate of the loss,' U.S.S.G. § 2B1.1 cmt. 3(C), for clear error." *United States v. Watts*, 535 F.3d 650, 658 (7th Cir. 2008). We see no clear error here. The GUEA paid $200,000 for 6300 Miller, so the "fair market value of the property unlawfully taken" was at least that amount. U.S.S.G. § 2B1.1 application note 3(C)(i) (2007); *see also United States v. Radziszewski*, 474 F.3d 480, 487 (7th Cir. 2007); *United States v. Hardy*, 289 F.3d 608, 613 (9th Cir. 2002). That amount is offset by the $50,000 the Historical Society received, *see* U.S.S.G. § 2B1.1 application note 3(E)(i) (2007), leaving $150,000 as the loss to the Historical Society from the sale or, alternatively, the amount the defendants unlawfully gained. Similarly, Lake County received $15,000 in property taxes when, absent the defendants' duplicitous lawsuit, it was entitled to $73,000, a difference of $58,000. Adding those two amounts, as the district court did, yields $208,000, thereby justifying the application of U.S.S.G. § 2B1.1(b)(1)(G).

We reject the defendants' arguments for a lesser loss. Powell and Harris argue that, by including both the loss to the Historical Society and the loss to Lake County, the district court impermissibly double-counted. But that argument ignores the fact that two separate entities suffered distinct losses, as embodied by the two counts of conviction. In count one, the Historical Society lost (or the defendants improperly gained) $150,000 because, as the owner of the property (at least on paper), it was entitled to the full proceeds from the sale. And in count two, the county lost $58,000 in property tax revenue that could have been paid from the proceeds of the sale.

Those are different losses, and the district court was right to include both of them.

In a variation on their first argument, the defendants also argue that the district court should have reduced the amount of property taxes payable from its calculation of the loss to the Historical Society, or the gain to the defendants, from the sale of 6300 Miller. According to Powell and Harris, had the Historical Society received the full $200,000, it would have had to pay the $73,000 in property taxes; thus, they claim that the $73,000 in property taxes ought to have been deducted from the loss. Alternatively, because Harris paid $15,000 in property taxes, they claim that amount should have been deducted from the $150,000 the district court calculated as the defendants' gain.

Neither Harris nor Powell cite any authority to support reducing either the loss or gain that way, and the commentary to the Guidelines do not provide for that type of reduction. *See* U.S.S.G. § 2B1.1 application note 3(D)-(E) (2007). Moreover, Harris's $15,000 payment of the property taxes was to further the fraudulent scheme. We have held that such expenses in furtherance of the unlawful activity need not be excluded from the gain. *See United States v. Marvin*, 28 F.3d 663, 664-65 (7th Cir. 1994). Furthermore, the loss to the Historical Society is undiminished by the property taxes because the purchase agreement between the GUEA and the Historical Society expressly obligated the GUEA, not the Historical Society, to pay any outstanding property taxes. The defendants' arguments concerning the reduction of the loss amount therefore have no merit.

Harris raises two other objections to his sentence. First, he challenges his two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice. We review a district court's factual findings supporting a § 3C1.1 enhancement for clear error. *United States v. Strode*, 552 F.3d 630, 635 (7th Cir. 2009). The district court's factual findings will stand as long as they are "plausible in light of the record in its entirety." *United States v. White*, 368 F.3d 911, 916 (7th Cir. 2004).

Harris's obstruction enhancement was based on his failure to comply with a grand jury subpoena requesting copies of tax returns and accounting schedules used to prepare the returns. In September 2006, FBI agents served Harris's law firm with the subpoena. In a signed statement, Harris responded to the subpoena by claiming that the law firm did not have the accounting schedules due to a "computer crash." However, on March 31, 2007, one week after the grand jury returned a superceding indictment adding a tax count against Harris, Harris's wife, who was the law firm's accountant, printed out the accounting schedules. At trial, she testified that Harris never gave her the subpoena and that she did not know that the grand jury had subpoenaed the law firm's accounting schedules until after the indictment.

According to the commentary to the obstruction enhancement, "concealing . . . evidence that is material to an official investigation" is obstruction. U.S.S.G. § 3C1.1 application note 4(d) (2007). The district court concluded that Harris's behavior was just that. We agree. At the very least, it was obstructive for Harris to fail to tell the one

person in his law firm who had control over the subpoenaed documents—his wife—about what documents the subpoena requested, since those documents were material to the investigation. Moreover, the computers' fortuitous recovery in time for Harris to use the accounting schedules in his own defense strongly suggests that Harris's "computer crash" excuse was unworthy of belief. The district court did not commit clear error in applying the obstruction enhancement.

Harris's second objection to his sentence is what he views as an unwarranted disparity between his sentence (55 months) and Powell's (37 months). Harris claims their conduct was similar and therefore warranted similar sentences. We reject that argument, first, because it is wrong on the law, *United States v. Omole*, 523 F.3d 691, 700 (7th Cir. 2008) ("This court refuses to view the discrepancy between sentences of codefendants as a basis for challenging a sentence."), and, second, because it is wrong on the facts. In many ways, Harris's conduct was more culpable than Powell's. The most important difference between the two is that Harris was the one who abused his position as the Historical Society's lawyer to pull off the sale of 6300 Miller. Indeed, it was Harris's own law firm and its trust account that was the locus of the fraud. Moreover, as we have discussed above, Harris obstructed justice by failing to turn over documents the grand jury had ordered him to produce. Given those significant differences, we see no error in the district court's decision to mete out a stiffer sentence to Harris than to Powell.

We turn now to Powell's final challenge to his sentence. He claims that the district court improperly disregarded his arguments at sentencing for leniency based on his advanced age and health problems. Regarding those arguments, the district court stated the following when it pronounced sentence:

> I specifically have taken into consideration everything that Mr. Milner has brought to my attention. The defendant's age, his lack of criminal history, his health problems. Those are certainly factors that weigh greatly on me and bear on the history and characteristics of the Defendant, *but they are, of course, also taken into account by the guidelines themselves*.

It is not clear what the district court meant by that last phrase that we have emphasized; it appears to be a misstatement of the law. Although the Guidelines do account for a defendant's criminal history, *see* U.S.S.G. §§ 4A1.1, 4A1.2, they do *not* factor in a defendant's age and health. Instead, the Guidelines list advanced age and serious health conditions as grounds for departure, though in limited circumstances: the commentary to the Guidelines states that, although age and health are "not ordinarily relevant in determining whether a departure may be warranted," they may be a "reason to depart downward" when a defendant is either "elderly" or "seriously infirm." U.S.S.G. §§ 5H1.1, 5H1.4. Of course, post-*Booker*, those departures are "obsolete." *United States v. Johnson*, 427 F.3d 423, 426 (7th Cir. 2005). While the district court can still use them for guidance, *United States v. Filipiak*, 466 F.3d 582, 584 (7th Cir. 2006), it has the

authority to consider Powell's physical impairments and advanced age when determining the sentence it believes appropriate under 18 U.S.C. § 3553(a). *United States v. Millet*, 510 F.3d 668, 680 (7th Cir. 2007).

Because the district court appeared to misapprehend its authority under § 3553(a), a remand is appropriate to give the district court an opportunity to clarify its ruling.[7] On remand, the district court should consider Powell's arguments about his advanced age and infirm health in light of the factors outlined in 18 U.S.C. § 3553(a).

## III.

The government presented sufficient evidence that Powell and Harris knowingly participated in a scheme to defraud the Historical Society that involved the use of the interstate wires, and both Powell's and Harris's

---

[7] The district court did state later on during its pronouncement of the sentence that, "[o]n the other issues of the defendant's age, and his lack of criminal history, I just don't think that those are enough to persuade me that a nonguideline sentence is appropriate in this case." However, that ambiguous statement, while coming closer to a correct understanding of the court's § 3553(a) authority, does not mitigate the court's previous statements, which appeared to rely on an invalid ground to reject Powell's arguments. A remand is therefore necessary. *Cf. United States v. Smith*, 562 F.3d 866, 874-76 (7th Cir. 2009) (finding no remand necessary where it was clear from context that the district judge did not rely on his previous misstatement of the law when pronouncing sentence).

convictions under 26 U.S.C. § 7206(1) survive review for plain error. Furthermore, the district court properly calculated the loss amount used to determine both Harris's and Powell's sentences by adding the $150,000 proceeds the defendants purloined from the sale of 6300 Miller to the $58,000 Lake County lost in property taxes as a result of the fraudulent lawsuit. The district court also correctly enhanced Harris's sentence based on his failure to comply with the grand jury subpoena requiring him to hand over accounting schedules material to the government's investigation of his 2001 tax returns. And the disparity between Harris's sentence and Powell's was warranted. We therefore AFFIRM the defendants' convictions and Harris's sentence. However, because the district court appeared to improperly reject Powell's arguments for leniency based on his advanced age and poor health, we VACATE and REMAND Powell's sentence for further proceedings consistent with this opinion.