┌─────────────────────────────────────────┐
│ **NONPRECEDENTIAL DISPOSITION** │
│ To be cited only in accordance with Fed. R. App. P. 32.1 │
└─────────────────────────────────────────┘

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 9, 2018
Decided January 7, 2019

**Before**

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 18-2256

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *Plaintiff-Appellee*, <br><br> *v.* <br><br> MATTHEW STOEN, <br> *Defendant-Appellant*. | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. <br><br> No. 1:14-cr-242 <br><br> Joan Humphrey Lefkow, <br> *Judge*. |

## O R D E R

Matthew Stoen and two partners formed a real estate investment firm and persuaded other investors to contribute capital to the firm. From the outset Stoen treated the firm's capital like his own account, spending lavishly on cars, travel, and other personal expenses. The government eventually caught on and charged Stoen with wire fraud. Stoen pleaded guilty but at sentencing asked the district court to reduce the loss amount used to calculate his advisory range under the Sentencing Guidelines by giving him credit for two payments—one that he made himself and another made at his request by a third-party—that benefitted the firm. The district court declined, and we now affirm.

**I**

In February 2006, Stoen, along with Joel Burns and Darren Niemann, formed Stone Rose LP with a plan to raise money to invest in real estate. Stoen became the managing partner while Burns and Niemann focused on raising funds from investors by selling limited partnership interests. During the first two years, Stone Rose raised more than $10 million from about 50 investors.

As soon as Stone Rose began operations in February 2006, Stoen began abusing his access to and control over the firm's capital by misappropriating funds from the firm's bank accounts. His misappropriation included, among other expenditures, $1,136,800 he transferred to his wife, $594,500 he transferred to a Chicago restaurant that he partially owned, and $35,000 he used as down payment on a Porsche. In the end, the government and Stoen agreed that he stole $2,575,378 over the course of approximately three years.

In November 2008 Stoen took a step to conceal his theft by distributing a financial report that falsely reported Stone Rose had cash on hand of $8,212,848, when in fact the firm had only $1,546,848. A group of investors eventually became suspicious and in June 2010 filed suit against Stone Rose. The discovery process revealed, if not confirmed, that Stoen had spent investor money on personal expenses.

A grand jury indicted Stoen in April 2014, and he pleaded guilty in October 2017 to one count of wire fraud based on his distribution of the fraudulent financial statement. At sentencing Stoen argued that the loss amount calculated as part of determining his advisory guidelines range should be reduced to reflect certain payments Stoen and another person made to Stone Rose. Two of these payments are at issue in this appeal.

The first relates to funds Stoen personally borrowed and then contributed to Stone Rose. To obtain these funds, Stoen lied to two individuals not associated with Stone Rose, telling them that he was the beneficiary of a trust fund and would quickly repay any money he borrowed from the third-party lenders. Each person agreed to loan Stoen money. In May 2007, the first individual loaned Stoen $500,000, which he then used to make a down payment on a property for Stone Rose. In December 2008, the second individual loaned Stoen $350,000, which he then wired to a Stone Rose bank account and put towards an interest payment on one of the firm's bank loans.

The upshot was that Stone Rose received or benefited from $850,000 that Stoen personally borrowed. But Stoen never used his own funds to repay the personal loans. He instead used Stone Rose's investors' funds to make a $250,000 payment towards one of the personal loans, and the remainder was left unpaid. Stoen argued to the district court that the loss amount should be reduced by $600,000—the amount that Stone Rose received from the total $850,000 in personal loans after subtracting the $250,000 payment he made using Stone Rose's funds. Relying on *United States v. Bohlen*, the district court disagreed, explaining that funds spent "facilitating a continuing fraud" do not warrant an offset against the loss amount. 562 F. App'x 520, 522 (7th Cir. 2014). The district court reasoned that the cash shortages Stone Rose experienced were, at least in part, caused by Stoen's misappropriation, and that he used the personal loans to cover the shortages so that investors would not become suspicious. All of this happened, the district court recognized, alongside Stoen's sending the fraudulently-inflated financial statement to the firm's investors. The district court determined that these facts and circumstances warranted denying Stoen the $600,000 credit.

The second disputed credit stems from mortgage payments made by a third-party, Steven Perry, towards a property owned jointly by Stone Rose and Perry. In March 2009, Stone Rose was short on cash and unable to pay its portion of the mortgage payments on the jointly-owned property. Perry, at the urging of Stoen, paid $463,135 toward the mortgage on behalf of Stone Rose between March 2009 and August 2010. After making the payments, Perry contended that Stone Rose's interest in the entity had been diluted from 50% to 5%. To avoid this dilution, Stoen executed a promissory note in September 2010, making himself personally liable to Perry for $900,000.

Stoen argued to the district court that the loss amount should be reduced by $463,135 to reflect Perry's mortgage payments because Stoen, as a result of the promissory note to Perry, became personally liable for the $463,135. The district court again rejected Stoen's argument, explaining that Stoen did not execute the promissory note until September 2010—after the investors filed their lawsuit against Stone Rose in June 2010—and therefore after Stoen was on notice that his misconduct was about to be detected. Relying on Application Note 3(E)(i) to U.S.S.G. § 2B1.1, which provides that money returned after the "defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency" will not count as a credit against the loss amount, the district court denied Stoen credit for the mortgage payments.

After giving Stoen credit for certain other payments not at issue in this appeal, the district court determined that the offense level should be increased 14 levels based on a loss amount of $1,271,382 (U.S.S.G. § 2B1.1(b)(1)(H)). The district court increased the offense level another 2 levels based on the number of victims, decreased it 3 levels for Stoen's acceptance of responsibility, and ultimately determined the advisory range to be 41 to 51 months' imprisonment. The court sentenced Stoen to 24 months' imprisonment—substantially below the advisory range—and ordered restitution equal to the loss amount, $1,271,382.

## II

On appeal Stoen renews his contention that the district court erred by denying him credit for these payments. He also argues that the district court's restitution calculation was wrong for the same reasons. Because Stoen frames his challenge to the restitution amount as merely derivative of (and entirely overlapping with) his challenge to the loss amount, so do we for purposes of this appeal. See *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013) (following the same approach).

"A district court 'need only make a reasonable estimate of the loss, not one rendered with scientific precision.'" *United States v. Durham*, 766 F.3d 672, 686 (7th Cir. 2014) (quoting *United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007)). We review the district court's factual findings in determining the loss amount for clear error, and to the extent that Stoen has challenged the definition of "loss" under the Guidelines, we proceed *de novo*. See *United States v. Sykes*, 774 F.3d 1145, 1149 (7th Cir. 2014); *United States v. Brownell*, 495 F.3d 459, 461 (7th Cir. 2007).

We see no clear error in any of the district court's factual findings or related inferences and conclusions. Nor does the sentencing transcript show that the district court applied an incorrect definition of loss when computing Stoen's advisory guidelines range.

As for the disallowed $600,000 credit, the district court reasonably determined that Stoen's misappropriation substantially contributed to, if not caused, Stone Rose's cash shortfall and that he personally borrowed money to pay Stone Rose's expenses. While the 2008 real estate market crash may have played some role in Stone Rose's cash shortage, the record shows that Stoen stole millions of dollars from Stone Rose during the same period it experienced a cash shortfall. In these circumstances, the district court did not commit clear error by concluding Stoen's misappropriation led to much of the shortfall that he then tried to conceal by using personal loans to cover Stone Rose's expenses. And the district court stood on solid legal ground when it determined that

the law allowed the conclusion that funds spent to facilitate a continuing fraud need not count as an offset against the loss amount. See *United States v. Powell*, 576 F.3d 482, 497 (7th Cir. 2009); see also *Bohlen*, 562 F. App'x at 522.

As for the disallowed $463,135 credit, the district court reasonably determined that Stoen did not take on personal liability to Perry for the mortgage payments made on behalf of Stone Rose until after he was already on notice that his fraud was about to be discovered. Here, too, the law is clear that money returned after the "defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency" does not count as a credit against the loss amount. U.S.S.G. § 2B1.1 cmt. n. 3(E)(i). There was no clear error in the district court's conclusion that Stoen's conduct reflected such circumstances, as the record demonstrates that by no later than June 2010 (if not earlier), he was aware the investors were catching on to his theft.

For these reasons, we AFFIRM.